2018 IL App (1st) 150026

No. 1-15-0026

January 16, 2018

Second Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|---|---|---|
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 19323 |
| | ) | |
| DESHAWN BRANCH, | ) | Honorable |
| | ) | Anna Helen Demacopoulos, |
| Defendant-Appellant. | ) | Judge presiding. |

_____

PRESIDING JUSTICE NEVILLE delivered the judgment of the court, with opinion. Justices Pucinski and Hyman concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a jury trial, defendant Deshawn Branch was convicted of one count of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2010)) and sentenced to 40 years' imprisonment. Defendant's sentence included a 25-year minimum enhancement because he personally discharged a firearm which caused great bodily harm to another person. 720 ILCS 5/8-4(c)(1)(D) (West 2010). On appeal, defendant contends that (1) the State failed to prove his guilt beyond a reasonable doubt because the two eyewitnesses, Kevin McAdory and Tayshonna

Mitchell, who identified him as the shooter, provided unreliable identification testimony; (2) his conviction should be reversed because the State engaged in prosecutorial misconduct during closing argument; and (3) his 40-year sentence is excessive in light of his youth and potential for rehabilitation. For the reasons set forth herein, we affirm the judgment of the trial court.

¶ 2    Defendant was charged by indictment with multiple counts of attempted first degree murder, aggravated battery with a firearm, aggravated discharge of a firearm, aggravated unlawful restraint, and unlawful restraint. The State nol-prossed eight counts, and the case proceeded to jury trial on one count of attempted first degree murder predicated on the personal discharge of a firearm which caused great bodily harm to the victim and one count of aggravated battery with a firearm.

¶ 3    Kevin McAdory testified that, shortly after midnight on October 15, 2011, he walked from his house at 14100 South School Street to his girlfriend's house on Tracy Street in Riverdale, Illinois. He stated that the streetlights "were on for the whole block." While walking on Tracy Street, McAdory saw defendant, whom he had been familiar with for six years, standing near a car with a group of people. He also saw a woman, named Tayshonna, with whom he was also familiar, sitting inside a car. McAdory identified defendant in court and testified about an incident between defendant's brother and another man from the neighborhood that occurred on March 23, 2011. During that incident, McAdory was shot. After the incident, McAdory spoke with the police and told them that defendant's brother had been present at the altercation.

¶ 4    When McAdory saw defendant, on October 15, 2011, defendant greeted him and asked him for a cigarette. McAdory gave defendant a cigarette and spoke to him for "a couple of

seconds." As he did so, defendant pulled out a ".38 caliber revolver" and said "[w]hy you snitch on bro?" Defendant then shot him four times. McAdory threw his hands up into the air and told defendant that he "didn't snitch on bro." He then started to run across the street but was hit in the back of the head with a gun and lost consciousness. When McAdory regained consciousness, he saw that everyone who had been in the area was gone. He stood up and attempted to walk home but again lost consciousness in the street. When he regained consciousness, police and paramedics were assisting him. He testified that he briefly spoke with a police officer before he was taken to the hospital. He did not remember the ambulance ride or arriving at the hospital.

¶ 5    At the hospital, about twelve hours after the shooting, McAdory spoke with Detective Glenn Williams and Lieutenant Bailey of the Riverdale Police Department. McAdory was on medication at the time and testified that he was "in and out of consciousness, going back to sleep." He spoke with the officers but did not tell them who shot him. McAdory stated that he "wasn't able to stay up" while speaking with the officers. Two days later, on October 17, 2011, the officers returned to the hospital and McAdory was "able to stay up for just enough to talk to them." He told the officers that defendant had shot him. On October 18, the officers returned to the hospital to conduct a photo array. After signing a photo spread advisory form, McAdory identified a photograph of defendant as the person who shot him.

¶ 6    McAdory testified that he remained in the hospital for almost a month. He detailed multiple surgeries, including a surgery to remove a bullet from his lung, and displayed his scars in open court. He also identified a jacket that he had been wearing on the night of the incident, which had two bullet holes in the back.

¶ 7     On cross-examination, McAdory stated that, on the date in question, he did not have an "issue" with defendant. He denied that, between March 23, 2011, and October 2011, there had been a dispute between him and defendant. McAdory acknowledged that he did not tell the first responding officer who shot him but was able to tell the officer his own name and address. McAdory stated that he did not tell the officers, who visited him in the hospital on October 15, that defendant shot him because he was in and out of consciousness. Defense counsel confronted him with his grand jury testimony, in which he answered a similar question by saying "because I wasn't too sure."

¶ 8     On redirect examination, the State presented McAdory with the next question and answer from his grand jury testimony in which he had explained that "he wasn't too sure" because he was "under medication" and going in and out of consciousness.

¶ 9     Tayshonna Mitchell testified that, on October 15, 2011, she was hanging out with friends and family, including defendant, near her car that was parked on the side of Tracy Street. She stated that, prior to the date in question, she had known defendant for two or three years and that he was a close friend of one of her cousins. When McAdory approached the group, Mitchell heard defendant ask him for a cigarette. She then turned away and heard a gunshot. When she looked in the direction of McAdory and defendant she saw McAdory stumbling across the street. She then saw defendant shoot McAdory two times in the back from two to four feet away. McAdory was able to stumble to the other side of the street. There, defendant got on top of McAdory and hit him with the gun. Mitchell got into her car and drove away.

¶ 10    On October 21, 2011, Mitchell was at work and was approached by police officers, who asked her about the shooting. Mitchell did not tell the officers that she had witnessed the

shooting because she did not want to talk about it. The officers drove her to a police station and told her that she could be charged if she was withholding information about the shooting. The officers also told her that they already had defendant in custody and would not allow her to make a phone call. Mitchell then told the officers about the shooting. The next morning, she identified defendant in a lineup as the person who shot McAdory on October 15, 2011.

¶ 11    On cross-examination, Mitchell testified that, on September 5, 2013, she met with defense counsel and an investigator. During the meeting, Mitchell told counsel that she felt pressured by the officers to identify defendant as the shooter. On redirect, Mitchell testified that, although she felt pressured to make an identification, she did not feel pressured to say anything that was not true. She explained that she was not handcuffed when the officers escorted her to the police station on October 21, 2011, and that the officers treated her "[s]ort of kind of like [she] was a victim." On recross, Mitchell testified that the officers did not allow her to drive to the police station in her own vehicle and that she spent the night in a jail cell before viewing the lineup the next morning.

¶ 12    Officer Roudez testified that, on October 15, 2011, he responded to a call of gunshots in the 14000 block of Tracy Street in Riverdale. When he arrived on the scene, he observed a man collapse in the street. Roudez approached the man and noticed a trail of blood coming from the back of his head and two bullet holes in the back of his jacket. Roudez called paramedics and asked the man for his name. He had to ask multiple times because the man was "semiconscious." Roudez was able to make out the man's first name but was unable to elicit more information as the man "attempted to say something, but he was not clear, his mouth moved, but no sounds were coming out." The State then rested its case-in-chief.

¶ 13    Detective Williams testified that, on October 15, 2011, he spoke with McAdory in the hospital. McAdory told Williams that he did not know who shot him. Williams testified that he did not interview a number of witnesses who had been present during the shooting, but was able to interview Tina Bell and Tayshonna Mitchell. He testified that he had spoken to Mitchell and transported her from her place of employment to a police station. Williams initially stated that he had not told her that she was being arrested for obstruction of an investigation. Upon being confronted with a police report he authored, Williams acknowledged that he told Mitchell that she was under arrest because she lied about not witnessing the shooting.

¶ 14    On cross-examination, Williams stated that, when he visited McAdory at the hospital, McAdory was "obviously injured" and appeared to be medicated because he was "not able to answer all of [his] questions."

¶ 15    In closing argument, the State argued that McAdory and Mitchell's testimony proved that defendant attempted to kill McAdory and that he personally discharged a firearm, which resulted in great bodily harm to McAdory.

¶ 16    Defense counsel argued that McAdory and Mitchell were not credible witnesses and questioned why, of the multiple people who were present at the scene, only Mitchell and McAdory testified:

> "[DEFENSE COUNSEL]: The only witness you have beside Kevin is a witness who was arrested. She tells you that there are five or six guys.
>
> * * *
>
> [DEFENSE COUNSEL]: Detective Williams interviewed Tina Bell. He interviewed Jayla Ross. He interviewed Mr. Murphy. Where were those witnesses?

* * *

[DEFENSE COUNSEL]: You got two out of the seven witnesses who were out there.”

¶ 17     In rebuttal, the State argued that not every witness who observed the shooting testified in the case but that the testimony of McAdory and Mitchell was sufficient to find defendant guilty of attempted murder. In doing so, the prosecutor stated:

“[STATE'S ATTORNEY]: You heard from two people out there, Kevin and Tayshonna. There was [sic] names of other people out there, some people the detectives were able to talk to. And, no, you didn't hear from all of them yesterday. Tayshonna came in, but for crying out loud, look what happened to Kevin. All Kevin did was say that the defendant's brother was there when he got shot in March.

[DEFENSE COUNSEL]: Objection.

[THE COURT]: Jurors have heard the testimony. They'll rely on their collective memories as to the evidence. Lawyers should confine their arguments to reasonable inferences. You may proceed.

[STATE'S ATTORNEY]: So of course Tayshonna didn't want to talk about it.”

¶ 18     After deliberating, the jury found defendant guilty of aggravated battery with a firearm and attempted first degree murder with a special finding that defendant personally discharged a firearm and caused great bodily harm to McAdory. The trial court denied defendant's amended motion for a new trial, and the case proceeded to sentencing.

¶ 19    At sentencing, the court heard arguments in aggravation and mitigation. In aggravation, the State noted that defendant's actions caused great bodily harm and endangered the lives of the people on the street. It also noted that, at the time of the shooting, defendant was on postrelease from boot camp for "a gun case." The State pointed out that defendant shot McAdory for cooperating with police in an investigation of his brother and asked for a sentence greater than the minimum of 31 years.

¶ 20    In mitigation, defense counsel noted that defendant was 21 years old. Counsel also noted that defendant's father was not present in his life, and the court was in receipt of letters written in support of defendant by members of his family, which helped shed light on defendant's upbringing. Counsel stated that defendant had been participating in educational and vocational programs while in the county jail and argued that the minimum 31-year sentence would be a deterrent to future bad behavior. Counsel pointed out that, other than his previous aggravated unlawful use of a weapon (AUUW) case, defendant had no criminal history. In allocution, defendant maintained his innocence.

¶ 21    After considering arguments in aggravation and mitigation, the trial court merged the aggravated battery conviction and sentenced defendant to 40 years' imprisonment. The 40-year sentence included a 15-year sentence on the Class X charge of attempted first degree murder and a 25-year mandatory enhancement for personally discharging a firearm that resulted in great bodily harm. In announcing sentence, the court noted that defendant had been sentenced to bootcamp a few months before the shooting and was on post-release at the time that the shooting occurred. The court stated that "the biggest factor in the Court's decision is the deterrent factor."

The court then denied defendant's motion to reconsider sentence, and defendant timely filed a notice of appeal.

¶ 22    On appeal, defendant first contends that the State failed to prove him guilty of attempted first degree murder beyond a reasonable doubt because the identification testimony of both McAdory and Mitchell was unreliable.

¶ 23    The due process clause of the fourteenth amendment protects defendants against conviction in state courts except upon proof beyond a reasonable doubt of every fact necessary to constitute the charged crime. *People v. Brown*, 2013 IL 114196, ¶ 48 (citing *Jackson v. Virginia*, 443 U.S. 307, 315-16 (1979)). When a court reviews the sufficiency of evidence, it must determine " 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Cunningham*, 212 Ill. 2d 274, 279 (2004) (quoting *Jackson*, 443 U.S. at 318). A reviewing court must decide whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Lloyd*, 2013 IL 113510, ¶ 42. This means that a reviewing court must draw all reasonable inferences from the record in favor of the prosecution. *Cunningham*, 212 Ill. 2d at 280. In doing so, " '[w]e will not reverse a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt.' " *Lloyd*, 2013 IL 113510, ¶ 42 (quoting *People v. Collins*, 214 Ill. 2d 206, 217 (2005)).

¶ 24    After examining the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found beyond a reasonable doubt that defendant shot McAdory. Although there was no direct physical evidence presented against defendant, there

was McAdory's and Mitchell's eyewitness identification of defendant as the shooter. Contrary to defendant's argument, we cannot say that McAdory's and Mitchell's identification was so unreliable that there exists a reasonable doubt as to defendant's guilt.

¶ 25    "It is well established that a single witness's identification is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification." *People v. Starks*, 2014 IL App (1st) 121169, ¶ 48. When assessing identification testimony, this court relies on the factors set out by the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). *Starks*, 2014 IL App (1st) 121169, ¶ 48. Those factors are (1) the opportunity the witness had to view the offender at the time of the offense, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the offender, (4) the level of certainty demonstrated by the witness at the identification confrontation, and (5) the length of time between the crime and the identification confrontation. *Starks*, 2014 IL App (1st) 121169, ¶ 48 (citing *Biggers*, 409 U.S. at 199-200).

¶ 26    In considering the *Biggers* factors in relation to McAdory's identification, we conclude that they weigh in the State's favor. First, the record shows that McAdory had ample opportunity to observe defendant. McAdory testified that he had known defendant for six years and interacted with him face-to-face prior to the shooting. He also testified that the streetlights "were on for the whole block." Second, McAdory testified to details about the gun, including its action-type and caliber, which demonstrates his high degree of attention at the time of the shooting. Regarding this factor, McAdory also stated that, prior to shooting him, defendant asked "[w]hy you snitch on bro?" McAdory detailed a prior incident involving defendant's brother and acknowledged that, after the incident, he spoke with police. Regarding the time between the

crime and McAdory's identification of defendant, McAdory identified defendant from a photo array only two days after the shooting. He also identified defendant in open court. We find McAdory's identification was sufficient to sustain the conviction.

¶ 27    This is especially so, where McAdory's testimony was corroborated by Mitchell, who testified to the same sequence of events and also identified defendant as the shooter. Mitchell testified that she was familiar with defendant and saw him shoot McAdory twice in the back as McAdory stumbled across the street. She also saw defendant stand over McAdory and hit him with the gun. Less than a week after the shooting, Mitchell identified defendant as the shooter from a lineup. She also identified defendant in open court.

¶ 28    Defendant nevertheless argues that McAdory's identification is unreliable because (1) he did not tell the first responding officer who had shot him; (2) he did not tell the officers, who visited him in the hospital twelve hours after the shooting, that defendant was the shooter; and (3) he did not call Detective Williams and Lieutenant Bailey upon regaining consciousness but waited for police to return to the hospital, two days later, before identifying defendant as the shooter. Defendant also argues that Mitchell's identification testimony is unreliable because of the circumstances under which she identified defendant as the shooter, *i.e.*, Williams testified that she was placed under arrest for "obstructing an investigation of aggravated battery." Defendant maintains that holding this identification reliable would encourage "future police misconduct."

¶ 29    However, these alleged inconsistencies were fully explored at trial during cross-examination. Although McAdory's and Mitchell's credibility may have been affected by these alleged inconsistencies, it was the responsibility of the trier of fact, in this case the jury, to

determine their credibility, to determine the weight to be given to their testimony, and to resolve any inconsistencies and conflicts in the evidence. *Starks*, 2014 IL App (1st) 121169 ¶ 51; *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). Based on their verdict, the jury resolved these inconsistencies in favor of the State. In doing so, the jury is not required to disregard the inferences that flow from the evidence or search out all possible explanations consistent with a defendant's innocence and raise them to a level of reasonable doubt. *People v. Alvarez*, 2012 IL App (1st) 092119, ¶ 51. We will not substitute our judgment for that of the trier of fact on these matters. *Sutherland*, 223 Ill. 2d at 242. As we previously pointed out, this court will reverse a defendant's conviction only when the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009). This is not one of those cases.

¶ 30    Defendant next contends that the trial court erred when it failed to sustain an objection to the prosecutor's rebuttal argument that more witnesses did not testify because they were afraid of defendant. He argues that this statement is not supported by the evidence and therefore deprived him of a fair trial.

¶ 31    Initially, we note that the parties disagree about the proper standard of review to apply to allegations of improper remarks during closing argument. As the State points out, there exists some confusion among Illinois courts regarding whether to apply a *de novo* or abuse of discretion standard. See *People v. Moody*, 2016 IL App (1st) 130071, ¶ 59 (reviewing supreme court cases using different standards of review when considering objections to a prosecutor's closing argument). However, we need not resolve this issue, as our holding in this case would be the same under either standard.

¶ 32 "Every defendant is entitled to fair trial free from prejudicial comments by the prosecution." *People v. Young*, 347 Ill. App. 3d 909, 924 (2004). However, a "[d]efendant faces a substantial burden in attempting to achieve reversal based upon improper remarks made during closing argument." *People v. Moore*, 358 Ill. App. 3d 683, 693 (2005). It is well-settled that a prosecutor is allowed "a great deal of latitude in closing argument[s]" as long the arguments are based on the evidence presented and the reasonable inferences therefrom. *People v. Alvidrez*, 2014 IL App (1st) 121740, ¶ 26. "Statements will not be held improper if they were provoked or invited by the defense counsel's argument." *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). To determine whether comments made during closing argument were proper, "the closing argument must be viewed in its entirety, and its remarks must be viewed in context." *Moody*, 2016 IL App (1st) 130071, ¶ 60. "Even if a prosecutor's closing remarks are improper, they do not constitute reversible error unless they result in substantial prejudice to the defendant such that absent those remarks the verdict would have been different." *Alvidrez*, 2014 IL App (1st) 121740, ¶ 26.

¶ 33 After reviewing the State's closing argument in its entirety, we find that the prosecutor's remarks during rebuttal were not improper because they were made in response to defense counsel's closing argument and were supported by the evidence presented at trial. In closing argument, defense counsel stated that only two of the seven witnesses of the shooting testified and asked "where were those witnesses?" The prosecutor's remarks in rebuttal suggested an answer to counsel's question: those witnesses may have been reluctant to speak with police or testify because they had seen defendant shoot another person for talking to police about his brother. The State's remark is supported by the evidence and reasonable inferences therefrom, which showed that defendant shot McAdory because he "snitched on bro" in an unrelated

shooting. Accordingly, the trial court did not err in overruling defense counsel's objection to the State's remark where the remark was both invited by defense counsel's argument and based on the evidence presented at trial. *People v. French*, 2017 IL App (1st) 141815, ¶¶ 48-49.

¶ 34    Finally, defendant contends that his 40-year sentence is excessive. A trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference on review. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). This is because a trial court has a superior opportunity "to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Absent some indication to the contrary, other than the sentence itself, we presume the trial court properly considered all relevant mitigating factors presented. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. In reviewing a defendant's sentence, this court will not reweigh these factors and substitute its judgment for that of the trial court merely because it would have weighed these factors differently. *People* v. *Busse*, 2016 IL App (1st) 142941, ¶ 20. Reviewing courts will not alter a defendant's sentence absent an abuse of discretion. *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 50. Moreover, a sentence which falls within the statutory range is presumed to be proper and " 'will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense.' " *People v. Brown*, 2015 IL App (1st) 130048, ¶ 42 (quoting *People v. Fern*, 189 Ill. 2d 48, 54 (1999)).

¶ 35    Here, we find that the trial court did not abuse its discretion in sentencing defendant to 40 years' imprisonment. Defendant was convicted of attempted first degree murder, a Class X felony with a sentencing range of 6 to 30 years' imprisonment. 720 ILCS 5/8-4(c)(1), 9-1(a)(1)

(West 2010); 730 ILCS 5/5-4.5-25(a) (West 2010). The jury's finding that defendant discharged a firearm which resulted in great bodily harm subjected him to a mandatory 25-year to natural life sentence enhancement. 720 ILCS 5/8-4(c)(1)(D) (West 2010). Accordingly, defendant faced a minimum prison sentence of 31-years and a maximum sentence of natural life. The trial court's 40-year sentence falls within the statutory range, and thus, we presume that it is proper. *Brown*, 2015 IL App (1st) 130048, ¶ 42.

¶ 36    Defendant does not dispute that his sentence fell within the permissible range given the mandatory enhancement for discharging a firearm resulting in great bodily harm. Defendant also does not claim that the trial court considered an improper sentencing factor. Rather, he argues that in light of "substantial mitigation," such as his youth and potential for rehabilitation, his 40-year sentence is excessive.

¶ 37    However, this mitigation evidence was presented to the trial court before it imposed its sentence. As noted above, we presume that the trial court properly considered all mitigation evidence. *Sauseda*, 2016 IL App (1st) 140134, ¶ 19. "To rebut this presumption, defendant must make an affirmative showing that sentencing court did not consider the relevant factors." *People v. Burton*, 2015 IL App (1st) 131600, ¶ 38. Defendant has failed to make such a showing.

¶ 38    The record shows that these factors were outlined in defendant's presentence investigation report and defense counsel's argument in mitigation. The trial court was presented with defendant's PSI and heard arguments in aggravation and mitigation. This included evidence of defendant's age, struggle with addiction, and family life. The trial court expressly considered defendant's age in mitigation. It also considered the fact that defendant was on postrelease from a sentence of boot camp when he shot McAdory. As such, defendant essentially asks us to

reweigh the sentencing factors and substitute our judgment for that of the trial court. This we cannot do. See *Busse*, 2016 IL App (1st) 142941, ¶ 20 (a reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently).

¶ 39   Moreover, a sentencing court is not required to award a defendant's rehabilitative potential greater weight than the seriousness of the offense. *People v. Bryant*, 2016 IL App (1st) 140421, ¶ 17. This court has stated that "[i]n fashioning the appropriate sentence, the most important factor to consider is the seriousness of the crime." *Busse*, 2016 IL App (1st) 142941, ¶ 28. Here, the evidence showed that defendant shot McAdory multiple times and hit him in the head with the gun because McAdory spoke with police in an unrelated incident. As a result of the shooting, McAdory was in the hospital for over a month, where he had multiple surgeries, including one to remove a bullet from his lung. See *People v. Saldivar*, 113 Ill. 2d 256, 269 (1986) ("While the classification of a crime determines the sentencing range, the severity of the sentence depends upon the degree of harm caused to the victim and as such may be considered as an aggravating factor in determining the exact length of a particular sentence ***." (Emphasis omitted.)). As such, we cannot say that the trial court abused its discretion in sentencing defendant to 40 years' imprisonment, a term nine years greater than the statutorily required minimum.

¶ 40   In reaching this conclusion, we are mindful of the United States Supreme Court cases that hold that capital punishment and sentences of life imprisonment without the possibility of parole are unconstitutional when applied to juvenile offenders. *Roper v. Simmons*, 543 U.S. 551 (2005) (capital punishment for juvenile offenders unconstitutional); *Graham v. Florida*, 560 U.S. 48

(2010) (life sentence without possibility of parole unconstitutional as applied to juveniles who had committed crimes other than homicide); *Miller v. Alabama*, 567 U.S. 460 (2012) (life sentence without parole unconstitutional as applied to juveniles who had committed homicide). These cases considered that, "as compared with adults, juveniles lack maturity, have an underdeveloped sense of responsibility, and are more easily influenced by peer pressure, and, because the character of a juvenile is not yet fully formed, his or her personality traits remain susceptible to change." *People v. Cavazos*, 2015 IL App (2d) 120171, ¶ 96. See *Roper*, 543 U.S. at 569-70; *Graham*, 560 U.S. at 68; *Miller*, 567 U.S. at 476.

¶ 41    Defendant argues that youthful offenders who are not technically juveniles should nevertheless be sentenced less harshly than older offenders as they have "developmental limitations that render them less blame worthy for their poor choices and because they are more capable of rehabilitation." Relying on *People v. House*, 2015 IL App (1st) 110580, and *People v. Harris*, 2016 IL App (1st) 141744, defendant contends that we should reduce his sentence to the minimum term of 31 years' imprisonment because he was 18 years old at the time of the shooting.

¶ 42    Although, in *House* and *Harris*, this court applied the Supreme Court's reasoning regarding juveniles to defendants who were 19 and 18, respectively, these cases dealt with sentences that were more severe and at least partially mandated by statute without any consideration of defendant's age. See *House*, 2015 IL App (1st) 110580, ¶ 101 (vacating a mandatory life sentence as applied to a 19-year-old under the proportional penalties clause, finding that the sentence "shocks the moral sense of the community"); *Harris*, 2016 IL App (1st) 141744, ¶ 69, *appeal allowed*, No. 121932 (Ill. May 24, 2017) (vacating a 76-year sentence,

which contained 50 years of mandatory sentence enhancements, finding that a *de facto* life sentence was unconstitutional as applied to an 18-year-old). Here, unlike in *House* and *Harris*, defendant is not making an "as applied" constitutional challenge to his sentence under the proportional penalties clause. As such, the applicability of *House* and *Harris* to this case is limited. More importantly, here, unlike *House* and *Harris*, defendant was not sentenced to a *de jure* or *de facto* life sentence. Rather, as mentioned, defendant was sentenced to 40 years' imprisonment, a term nine years above the statutory required minimum.

¶ 43    We also considered defendant's argument that his criminal history should not have been considered as an aggravating factor because his only prior conviction for AUUW was "subject to vacatur" pursuant to *People v. Aguilar*, 2013 IL 112116, and its progeny. Here, the record is all but silent on the details of defendant's previous conviction. This aside, the record does not show that defendant's criminal history was the primary factor the court considered in imposing sentence. Rather, in imposing sentence, the court noted that "the biggest factor in the court's decision is the deterrent factor." Given the nature of the crime and the severity of the victim's injuries, we cannot say that the trial court abused its discretion in using defendant's criminal background as an aggravating factor. See *People v. McFadden*, 2016 IL 117424, ¶¶ 41, 46 (declining to remand for resentencing where "the constitutional invalidity of defendant's 2002 AUUW conviction is not confirmed by the record" and his sentence was only eight years above the statutory minimum sentence). Finally, because the defendant turned 18 less than three months before the offense, we believe the legislature should consider promulgating new sentencing guidelines for offenders between the ages of 18 and 20. See Andrea MacIver, *The Clash Between Science and the Law: Can Science Save Nineteen-Year-Old Dzhokhar Tsarnaev's*

*Life?*, 35 N. Ill. U. L. Rev. 1, 15-24 (2014) (new science shows the brains continues to develop until one's early 20s).

¶ 44    For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 45    Affirmed.