2020 IL App (2d) 180822-U
No. 2-18-0822
Order filed August 17, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-1923 |
| ROBERT DONTRELL JAMES Jr., | ) ) | Honorable Ronald J. White, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices McLaren and Bridges concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Defendant's conviction for possession/intent to deliver drugs based on a police officer's observation of a hand-to-hand drug transaction on a city street in broad daylight was upheld where the officer's identification of defendant as a participant was reliable based on all the circumstances.

¶ 2    Defendant, Robert Dontrell James Jr., appeals from his convictions in the circuit court of Winnebago County on one count of possession with the intent to deliver heroin (720 ILCS 570/401(c)(1) (West 2016)), one count of possession with the intent to deliver cocaine (720 ILCS 570/401(c)(2) (West 2016)), and one count of resisting a peace officer (720 ILCS 5/31-1(a) (West 2016)).  He contends that the State did not prove beyond a reasonable doubt that he was the person

who committed the offenses.  Because the in-court identification was reliable and sufficient to prove that defendant was the perpetrator, we affirm.

¶ 3                                I. BACKGROUND

¶ 4      The following facts were established at defendant's February 2018 bench trial.  At approximately 10 a. m. on July 11, 2017, Officer Josh Sims of the Rockford Police Department was patrolling in his squad car in downtown Rockford.  The weather was sunny and clear.  As Officer Sims drove slowly north on Court Street, he saw ahead of him a white male and a black male walking north on the west side of Court Street.  The white male was closer to the street.

¶ 5      As Officer Sims got closer to the two men, he saw the black male reach into his right front pocket and hand something to the white male.  Officer Sims believed that they were engaged in a hand-to-hand drug transaction.

¶ 6      After seeing the exchange, Officer Sims drove past the two men to the first cross street and made a U-turn in the intersection.  As he did so, he continued to observe the two men.  He then parked his squad car just south of that intersection, exited, and approached the two men.  He was about 10 feet from the pair when he exited the squad car.  The two men were facing Officer Sims as he approached on foot.

¶ 7      When Officer Sims was within 5 to 10 feet of the men, he told them that he wanted to talk to them.  He continued walking toward the men until he was about five feet from them.

¶ 8      At that point, the black male started stepping backward, while the white male stayed where he was.  As Officer Sims continued to approach, the black male began running.  Officer Sims chased him between two adjacent buildings.  As the black male ran between the buildings, he used his right hand to pull a plastic baggy from his right front pants pocket and tossed the baggy on the

ground. The black male then climbed over an eight-foot chain link fence. When Officer Sims realized that his radio was dead, he terminated the chase.

¶ 9 After ending the chase, Officer Sims retrieved the plastic baggy. Later testing indicated that it contained several smaller bags of cocaine and heroin. Officer Sims then spoke to the white male, who had crossed the street, and released him. According to Officer Sims, he looked in the area where he had spoken to the white male but found no contraband.

¶ 10 Officer Sims then logged the drug evidence at the police station. After doing so, he drove to a nearby church parking lot to complete his report. As he sat in his squad car writing his report, Detective Veruchi of the Rockford Police Department arrived. Officer Sims had not requested that Detective Veruchi meet with him.

¶ 11 According to Officer Sims, Detective Veruchi remarked that he had heard that Officer Sims was in a foot chase. Detective Veruchi then provided Officer Sims with a possible name of the black male. The name was defendant's. Officer Sims then looked on his squad car computer at mug shots of defendant. According to Officer Sims, the most recent mug shot of defendant matched the appearance of the black male. He told Detective Veruchi that the person in the mug shot was the black male. Officers Sims viewed defendant's mug shot approximately an hour and a half after the incident.

¶ 12 In his report, Officer Sims described the suspect as being in his 30s, approximately 5 feet 10 inches, and weighing 190 pounds. He was wearing a white tank top and blue jean shorts. The description in the report was based solely on Officer Sims's observations during the incident.

¶ 13 Officer Sims identified defendant in court as the black male he chased on July 11, 2017. When asked if he had any doubt about his identification, he answered that "[w]ithout a doubt that is the subject."

¶ 14    On cross-examination, Officer Sims admitted that he never included in his description whether the black male had facial hair or what his hair style was. Nor did he mention anything about the black male having tattoos on his arms. Officer Sims admitted that the description of defendant provided with the mug shot indicated that defendant was 5 feet 5 inches, 168 pounds, and 26 years old. He further admitted that he never asked the white male to view a photo lineup to identify the black male or had the plastic baggy examined for latent fingerprints.

¶ 15    On redirect, Officer Sims explained that the discrepancy between his description of defendant and defendant's actual physical characteristics was a matter of his "judgment which isn't a hundred percent correct." When asked if there was any doubt in his mind that defendant was the black male, Officer Sims answered that he had "no doubt."

¶ 16    To demonstrate that he had tattoos on his arms, defendant removed his shirt in front of the judge. He had a T-shirt underneath. The trial court noted that defendant had tattoos on both shoulders and arms.

¶ 17    On rebuttal, Officer Sims testified that he could not recall seeing any tattoos on defendant. He did not know whether defendant had any tattoos. He explained that, as he approached defendant, he was focused on his face. During the chase, he focused on defendant's hands in case he had a weapon. Officer Sims admitted on cross-examination that, with his attention drawn to defendant's hands for safety purposes, he had the opportunity to see defendant's right arm.

¶ 18    In ruling, the trial court noted that the dispositive issue was identification of the black male. The court stated that, in assessing Officer Sims's testimony, it considered his ability and opportunity to observe, his memory while testifying, his manner in testifying, any interest, bias, or prejudice that he might have, and the reasonableness of his testimony in light of all the evidence. Because the issue was identification, the court carefully observed Officer Sims as he testified.

¶ 19    The trial court found that the tattoos on defendant's right arm were "mainly in the inside and the back of the arm."  The court added that defendant was dark-skinned and that the tattoos were also dark.

¶ 20    The trial court noted that Officer Sims had a clear, unobstructed view of defendant's face from as close as five feet.  He further had the opportunity to look at defendant's most recent mug shot before identifying him in court.  The court further found that it was not unnecessarily suggestive when Detective Veruchi provided defendant's name to Officer Sims.  The court also considered the inconsistency between Officer Sims's initial description and defendant's actual physical characteristics.  The court found that Officer Sims did not hesitate in his in-court identification, was certain that defendant was the black male, and never wavered in that identification.  Although the court did not know why Officer Sims never saw defendant's tattoos, it noted that he was focused on defendant's face.  Finally, the court reiterated that Officer Sims had the ability and opportunity to identify defendant from five feet away and that he never hesitated in his in-court identification.  Thus, the court found defendant guilty.

¶ 21    In denying defendant's motion for a new trial, the trial court stated that, after looking closely at Officer Sims's face and listening to his testimony, it believed that the identification was proper. The court sentenced defendant to two concurrent 12-year prison sentences,[1] and defendant filed this timely appeal.

¶ 22                                    II. ANALYSIS

¶ 23    On appeal, defendant contends that Officer Sims's identification was unreliable, because of the inconsistencies between the physical description in the police report and defendant's actual

---

[1] The trial court imposed no sentence on the resisting conviction.

physical characteristics, the failure of Officer Sims to observe any of defendant's tattoos, and the unnecessarily suggestive nature of the pretrial identification based on the mug shot.

¶ 24    When a court reviews the sufficiency of the evidence, it views the evidence in the light most favorable to the prosecution and determines whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Lloyd*, 2013 IL 113510, ¶ 42. This means that the reviewing court must draw all reasonable inferences from the record in favor of the prosecution. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). The reviewing court will not reverse a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of the defendant's guilt. *Lloyd*, 2013 IL 113510, ¶ 42.

¶ 25    The State bears the burden of proving beyond a reasonable doubt the identity of the person who committed the charged offense. *People v. Lewis*, 165 Ill. 2d 305, 356 (1995). It is well established that a single witness's identification is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification. *People v. Branch*, 2018 IL App (1st) 150026, ¶ 25. When assessing identification testimony, a court must rely on the factors set out in *Neil v. Biggers*, 409 U.S 188, 199-200 (1972). *Branch*, 2018 IL App (1st) 150026, ¶ 25. Those factors are (1) the opportunity the witness had to view the offender at the time of the offense, (2) the witness's degree of attention, (3) the accuracy of the witness's prior identification, (4) the level of certainty of the witness at the identification confrontation, and (5) the length of time between the crime and the identification confrontation. *Branch*, 2018 IL App (1st) 150026, ¶ 25.

¶ 26    In this case, Officer Sims was the sole identification witness. Thus, his testimony was sufficient to sustain defendant's conviction if he viewed defendant under circumstances permitting

a positive identification. When we consider the five *Biggers* factors, they collectively support Officer Sims's in-court identification.

¶ 27 Officer Sims had ample opportunity to view defendant. The day was clear and sunny, and nothing obstructed Officer Sims's view of defendant. Officer Sims walked to within five feet of defendant, who was facing him. Officer Sims testified that, up until defendant ran, he was focused on defendant's face. The first factor strongly supports the identification.

¶ 28 Officer Sims also paid attention to defendant. After seeing defendant hand something to the white male, Officer Sims was alerted to a possible drug deal. He kept defendant in his view as he turned his squad car around to face defendant. After he exited the squad car, he remained focused on defendant's face as he walked to within five feet of defendant. There is no doubt that Officer Sims was highly attentive in his observation of defendant. That factor strongly supports his identification.

¶ 29 We next consider the accuracy of Officer Sims's prior identification. He originally described defendant as being 5 feet 10 inches tall, weighing 190 pounds, and being in his 30s. Defendant was actually 5 feet 5 inches, 168 pounds, and 26 years old. Although Officer Sims's original description varied from defendant's actual height, weight, and age, it was not so disparate as to alone render his in-court identification suspect. Moreover, the discrepancies were not as significant considering that Officer Sims's' in-court identification was based primarily on his facial recognition of defendant.

¶ 30 Although defendant points to Officer Sims's failure to include his tattoos in the original description, Officer Sims testified that he was focused on defendant's face as he approached. After defendant ran, Officer Sims was focused for safety reasons on defendant's hands. Further, as the

trial court noted, defendant was dark-skinned and the tattoos were dark. The failure to note the tattoos did not render Officer Sims's identification unreliable.

¶ 31    Officer Sims was also very certain about his identification. He testified that he had no doubt about his identification. Further, the trial court found that Officer Sims never hesitated in identifying defendant as the perpetrator. Thus, this factor supports the reliability of the in-court identification.

¶ 32    The final factor also supports the identification. Officer Sims identified defendant from his mug shot within about an hour and a half after the incident. During that time, Officer Sims was involved in following up on the incident. That brief period did not render the identification unreliable. See *People v. Green*, 2017 IL App (1st) 152513, ¶ 113 (identifications occurring several months after the crime found reliable).

¶ 33    When we view the *Biggers* factors collectively, they clearly support the reliability of Officer Sims's in-court identification.

¶ 34    Defendant asserts, however, that Officer Sims's in-court identification was rendered unreliable by the unnecessarily suggestive viewing of defendant's mug shot. We disagree.

¶ 35    Only where a pretrial identification is unnecessarily or impermissibly suggestive so as to produce a very substantial likelihood of irreparable misidentification is evidence of that, and any subsequent identification, excluded as violating due process. *People v. Ramos*, 339 Ill. App. 3d 891, 897 (2003). A defendant must first prove that the confrontation was so unnecessarily suggestive and conducive to irreparable misidentification that he was denied due process. *Ramos*, 339 Ill. App. 3d at 897. If the defendant meets that burden, then the State must prove that the identification was independently reliable. *Ramos*, 339 Ill. App. 3d at 897. The factors relevant to

determining the independent reliability of the identification are those set forth in *Biggers*. *Ramos*, 339 Ill. App. 3d at 897-98.

¶ 36    Here, defendant has not met his burden of proving that Officer Sims's initial identification of defendant's mug shot was so unnecessarily or impermissibly suggestive that it irreparably harmed his subsequent in-court identification.  Although Detective Veruchi provided Officer Sims with defendant's name as the possible suspect, there is nothing in the record to indicate that Detective Veruchi urged or pressured Officer Sims to identify defendant as the perpetrator.  Indeed, there is nothing unnecessarily suggestive about one police officer indicating to another officer the possible identity of a suspect.  Nor was it unnecessarily suggestive for Officer Sims, having been given defendant's name as a possible suspect, to look at recent photos of defendant to see if he in fact was the perpetrator.  Although defendant suggests that Detective Veruchi was Officer Sims's senior officer, the record does not support that suggestion or otherwise show that Detective Veruchi had supervisory authority over Officer Sims.  Under the circumstances here, we cannot say that either Detective Veruchi providing defendant's name as a possible suspect, or Officer Sims's viewing of defendant's mug shot thereafter, was so suggestive that it rendered the in-court identification unreliable.

¶ 37    Even if Officer Sims's in-court identification was the product of an unnecessarily suggestive pretrial identification, it was shown to be independently reliable.  As discussed, the *Biggers* factors strongly showed that the in-court identification was otherwise reliable.  See *People v. Daniel*, 2014 IL App (1st) 121171, ¶ 21.

¶ 38    Finally, we note that the trial court closely scrutinized Officer Sims's testimony.  Indeed, the court emphasized that, because the dispositive issue was defendant's identity, it looked closely at Officer Sims and listened carefully to his testimony.  After doing so, the court expressly found

that Officer Sims's in-court identification was proper. Considering the court's role as trier of fact, we cannot conclude that the identification was so unreliable or unsatisfactory that defendant's conviction must be reversed. See *In re Keith C.*, 378 Ill. App. 3d 252, 258 (2007) (reliability of a witness's identification is a question for the trier of fact); *People v. Coleman*, 301 Ill. App. 3d 37, 42 (1998) (trier of fact has prerogative to judge credibility of witnesses and resolve conflicts in the testimony).

¶ 39                                    III. CONCLUSION

¶ 40     For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 41     Affirmed.