2024 IL App (1st) 220250-U

FOURTH DIVISION
Order filed: May 2, 2024

No. 1-22-0250

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 01 CR 373 |
| MARLON PORTER, | ) ) ) | Honorable Carol M. Howard, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Rochford and Justice Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Following a resentencing proceeding pursuant to *Miller v. Alabama*, 547 U.S. 460
       (2012), a juvenile offender's thirty-eight-year sentence for first-degree murder is
       affirmed when the record reflects that the circuit court considered all relevant
       factors in mitigation and did not consider any improper factors.

¶ 2    Following a resentencing proceeding, the defendant, Marlon Porter, appeals his new

sentence of thirty-eight years in prison for a murder that he committed when he was seventeen

years old. The defendant contends that the sentence failed to account for his potential for

rehabilitation and was the result of the circuit court considering improper sentencing factors. We see no error and affirm.

¶ 3    In 2000, the defendant was indicted on one count of first-degree murder for the killing of twelve-year-old Orlando Patterson. He and his codefendant, Lakisha Woodard, were tried simultaneously by separate juries. The evidence at trial showed that on the evening of November 10, 2000, Woodard picked up the defendant in a car, gave him a gun, pointed out a young man on the street who was standing with a group of children, and told the defendant to shoot him. Woodard believed that the young man whom she had identified had slashed her face with a knife in a previous altercation, and she wanted to retaliate. The defendant got out of the car, walked up to the young man, and shot him in the back. The defendant later learned that Woodard had misidentified the young man, who was actually the twelve-year-old Patterson. The jury found the defendant guilty, and the court sentenced him to fifty years' imprisonment for first-degree murder and an additional twenty-five years for personally discharging the firearm that caused Patterson's death, for a total term of seventy-five years.

¶ 4    The defendant appealed his sentence, arguing that it was excessive and failed to account for his subordinate role in planning the shooting, his young age, his limited criminal history, and his potential for rehabilitation. We affirmed the sentence in an unpublished order. See *People v. Porter*, 366 Ill. App. 3d 1223 (2006) (table) (unpublished order under Supreme Court Rule 23).

¶ 5    In July 2007, the defendant filed a petition for postconviction relief, which the circuit court dismissed. This court affirmed that dismissal. See *People v. Porter*, 393 Ill. App. 3d 1103 (2009) (table) (unpublished order under Supreme Court Rule 23).

¶ 6 In June 2017, the defendant filed a *pro se* motion for leave to file a successive postconviction petition, seeking resentencing pursuant to *Miller v. Alabama*, 547 U.S. 460 (2012). The court granted leave to file and appointed counsel for the defendant. Counsel amended the defendant's successive petition and also filed a report from developmental psychologist Dr. James Garbarino regarding the effect that the defendant's upbringing and development might have had on the defendant's actions. In its response, the State agreed that the defendant was entitled to resentencing. A resentencing hearing was held on December 14, 2021.

¶ 7 Dr. Garbarino was the first to testify at the hearing. He stated that he prepared his report after reviewing the defendant's 2004 presentence investigation (PSI), reviewing the transcript of the defendant's original sentencing hearing, and communicating with the defendant in writing and over the phone. In these communications, Dr. Garbarino interviewed the defendant about his life experiences and administered a standard survey called the Adverse Child Experiences Scale (ACE). According to Dr. Garbarino, two thirds of Americans score a zero or one on the ACE scale, and only one in one hundred score seven or higher. The defendant scored a seven. Dr. Garbarino explained that the defendant's childhood experiences, and specifically his having seen dead bodies, witnessed violence, and lost people close to him, helped to create violent tendencies:

"[T]hose kinds of traumas tend to inhibit the development of sophisticated, moral reasoning and the kind of prosocial behavior that we ideally hoped for in 17 years olds.

That coupled with the fact that he was exposed to a lot of negative social environments growing up, all of which tend to distort thinking and feeling *** particularly about violence. What I often call a war zone mentality in which vigilantism created

assaults, hypervigilance without an assault, all of these things combined, it produces high levels of violence, particularly at the hands of adolescents."

¶ 8 Dr. Garbarino was then asked about the defendant's PSIs, and specifically whether he could explain why the defendant gave very positive answers regarding his childhood in the original 2004 PSI but then painted a largely negative picture for the 2020 PSI prepared for the resentencing proceeding. Dr. Garbarino stated that for several reasons it is common for young offenders to be less likely to report trauma and adversity. For one, it is often considered taboo to disclose negative family information, and in this particular case the defendant's mother told him, "What goes on in this house, stays in this house." Additionally, Dr. Garbarino stated that defense attorneys sometimes coach defendants to present a positive picture of their lives, and he explained that PSI questions that ask about abuse inherently require the defendant to first define the way they have been treated as abuse, which is often not something they accept and acknowledge until later in life.

¶ 9 The defense then asked Dr. Garbarino how the type of trauma that the defendant experienced, specifically seeing a murder at six years old, witnessing the death of his best friend when he was twelve, and seeing his father trying to drown his mother, might affect a person. Dr. Garbarino explained that witnessing that type of trauma can have more of a negative effect than actually being the target yourself and that it undermines positive development and makes you vulnerable to various types of negative development.

¶ 10 Stanley Newby testified that he is a correctional food service supervisor and oversaw the defendant's work as a line server in the prison cafeteria. Newby observed that the defendant interacted well with everyone, was consistent, kept an upbeat mood, and enlightened everyone else's mood, even in intense situations. Although that was the only capacity in which Newby

worked with the defendant, he was aware that the defendant had obtained a job working for Correctional Industries, which provides goods and supplies to many parts of the Illinois Department of Corrections and other entities. According to Newby, jobs with Correctional Industries are highly sought after by inmates, and obtaining such a job requires a GED, recommendations from staff, and an interview. The job also requires a clean good-conduct record, which Newby testified is very difficult to maintain at the defendant's facility, particularly because other inmates will sabotage inmates who work for Correctional Industries in an attempt to create a job opening for themselves.

¶ 11    Anthony Lowery testified that he is the defendant's uncle. He had known the defendant since his birth and was familiar with his upbringing. Lowery reported that the defendant's mother suffered from anxiety and bipolar depression and the defendant's father was a substance abuser who physically abused his children and their mother. According to Lowery, the defendant's father's abuse of his mother was so extensive that the repeated blows to the head lead to her having Parkinson's disease. The defendant's father also beat the children with cable cords, stole the children's money, and rampaged through the house. Lowery explained that the defendant's mother placed a figurative "steel door" between the family business and the outside world, "prevent[ing] any information from coming out, other than what she said it was" and "prevent[ing] other people from reaching in to try to provide the necessary support that was needed to guide the young sons into a positive pathway." Lowery testified that he is the associate vice president of the community housing program at the Safer Foundation, where he goes to prisons to speak with inmates who are about to be released and also mentors young people who have juvenile convictions. Based on his experience in that job, his opinion was that the defendant's rehabilitation has been "outstanding."

¶ 12 Lastly, Lesetta Porter testified that she is the defendant's half-sister. They share the same father, whom Porter stated was incarcerated in Texas. Porter testified that, although she lived separately with her mother, she was close with her half-brothers, including the defendant. Her brothers told her about their father's abuse and told her that they were always afraid when their father came home. According to Porter, since he has been incarcerated the defendant has obtained three degrees, become an ordained minister, and has counseled young boys. Porter stated that the defendant has had and will always have family support.

¶ 13 The State introduced victim impact statements from Patterson's father, mother, two sisters, a cousin, and two aunts, following which the State rested.

¶ 14 The defendant gave a statement in allocution in which he gave the Patterson family his "deepest and sincerest apologies" and stated that not a day goes by that he does not think about the pain that he has caused. The defendant stated that he is not a "monster or cold-blooded" but rather "was fractured, flawed, and ill-equipped to deal with that moment in [his] life." He has spent every moment of the last nineteen years trying to improve himself, and he hopes to save lives by mentoring others.

¶ 15 The court then issued its ruling:

> "I have considered the factors in mitigation and aggravation. The clear aggravated factor is the fact of this case, this was a brutal, senseless -- senseless killing. To just walk up to someone, shoot them in the back of the head is cruel. So that is very, very aggravating.
>
> And I assure you, I have listened to all the witnesses testify today. And listening to the victim impact statements, the pain that those acts can cause, not only to Mr. Patterson's family but also to your family and to your loss. That, of course, is very [aggravating].

I have also considered the factors in mitigation. Those factors are set forth in the *Miller* opinion. They are also codified [in] 730 ILCS 5/5-415-10(f).

And I have considered the fact that you were 17 years of age when this happened. That you were subject to the pressure of the codefendant who was older and apparently much crueler.

I have already considered the factors involving your home environment. The fact that you were living in a situation where your mother was dealing with mental health issues and your father was on drugs.

I have already considered your potential for rehabilitation and the accomplishments that you have made since this incident happened -- occurred, you have gone to school. Not only your high school diploma but also your college degree. And you have made efforts to turn your life around.

You have worked with other people in the jail, hoping to steer the younger inmates from the life of crime that you found yourself in at an early age.

This is a difficult case and I understand the family's pain. I know that no matter what is done today, Orlando Patterson will not be brought back.

What I am going to do is to try to impose a sentence that I think is not only the horrible act that you committed and also the steps towards rehabilitation that you have taken.

And considering all of those factors I think that a sentence of thirty-eight years in the Illinois Department of Corrections is the appropriate sentence."

¶ 16     One week later, the defendant then filed a motion to reconsider sentence in which he argued that the court made a factual error when it said in its ruling that the defendant had shot Patterson in the back of the head, when Patterson was actually shot in the upper back, and that his sentence was excessive because the court failed to give adequate weight to his rehabilitation. At the hearing on the defendant's motion, the defendant reiterated the arguments made in the motion and added that the court also should have considered the fact that it was Woodard, and not the defendant, who planned the shooting. The court denied the defendant's motion for reconsideration, explaining:

> "At the sentencing hearing that this Court conducted on December 14th, I carefully considered all the factors in aggravation and mitigation. And one of the reasons that I re-sentenced Mr. Porter to 38 years in the Illinois Department of Corrections at that point was because all the efforts that he has taken to turn his life around. I carefully considered the factors or the evidence submitted in mitigation. *** I do believe that that 38-year sentence is appropriate. *** So the motion to reconsider the sentence in terms of reducing the sentence is denied ***."

This appeal follows.

¶ 17     The defendant raises three issues in this appeal. In his first and third issues, which we will consolidate, the defendant contends that his sentence is excessive and failed to account for his rehabilitative potential. In his second issue, the defendant asserts that the court erred in misstating that the defendant had shot Patterson in the back of the head, in considering inherent aspects of the offense as aggravating factors, and in purportedly finding the offense "brutal and heinous." We see no merit to any of his arguments.

¶ 18    We first address the defendant's argument that his sentence is excessive and failed to accurately reflect his rehabilitative potential. Citing several cases from the 1970s, namely *People v. Kish*, 58 Ill. App. 3d 215 (1978), *People v. Johnson*, 29 Ill. App. 3d 763 (1975), and *People v. Griffin*, 8 Ill. App. 3d 1070 (1972), the defendant asserts that the starting point for his sentence should have been the statutory minimum of twenty years' imprisonment and that any additional time would be "dependent upon the court's divination as to the length of time required to achieve rehabilitation." *Johnson*, 29 Ill. App. 3d at 767. Building on that principle, the defendant then contends that the evidence presented at his resentencing proceeding showed that he has great rehabilitative potential and that the court erred in purportedly adding eighteen years for rehabilitation.

¶ 19    However, as the State points out in its answer brief, the defendant's argument is fatally flawed. The sentencing scheme that the defendant describes, and which was applied in the cases he cites, was Illinois' old indeterminate sentencing system under which a defendant would be given a minimum and maximum sentence and then have his or her actual time of release determined later by a parole board. See *People v. Purcell*, 2013 IL App (2d) 110810, ¶¶ 15–16 (explaining indeterminate sentences). That indeterminate sentencing scheme was abolished and replaced nearly fifty years ago with a determinate sentencing scheme under which there is a statutory minimum and maximum sentence for each offense and the defendant is sentenced to a definite term within that range. See *People v. Fern*, 189 Ill. 2d 48, 60 (1999) ("The primary change effected by the 1977 legislation was to abolish our previous system of indeterminate sentencing and replace it with a system of determinate sentencing."); *Lane v. Sklodowski*, 97 Ill. 2d 311, 316–17 (1983)

(explaining determinate sentencing). Thus, the defendant's premise that his sentence unjustifiably included eighteen years for rehabilitation is incorrect, and that flaw defeats his argument.

¶ 20    However, the defendant also makes a proper argument that his sentence is excessive and that the court failed to accord sufficient weight to his rehabilitative progress. "A trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference on review." *People v. Branch*, 2018 IL App (1st) 150026, ¶ 34 (citing *People v. Alexander*, 239 Ill. 2d 205, 212 (2010)). "Absent some indication to the contrary, other than the sentence itself, we presume the trial court properly considered all relevant mitigating factors presented." *Id.* (quoting *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19). Reviewing courts will not reweigh the evidence and substitute its judgment for the circuit court's (*id.* (citing *People v. Busse*, 2016 IL App (1st) 142941, ¶ 20)), nor will they change a defendant's sentence absent an abuse of discretion (*id.* (citing *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 50)). "Moreover, a sentence which falls within the statutory range is presumed to be proper and 'will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense.' " *Id.* (quoting *People v. Brown*, 2015 IL App (1st) 130048, ¶ 42). A sentence is also deemed excessive if it is imposed "without regard for a particular defendant's rehabilitative potential." *People v. Daly*, 2014 IL App (4th) 140624, ¶ 25.

¶ 21    The defendant contends that his sentence is excessive because it was imposed without regard for his rehabilitative potential. For support, he primarily relies on *People v. McKinley*, 2020 IL App (1st) 191907, in which this court reduced a juvenile offender's thirty-nine-year sentence for first-degree murder to twenty-five years when the defendant had presented "overwhelming" evidence of his accomplishments and rehabilitation while in prison and "[t]he trial judge's brief,

general references to defendant's rehabilitation indicate that the trial judge disregarded the extent of defendant's rehabilitation and did not afford it adequate weight." *Id.* ¶ 78. The defendant argues that his case is analogous to *McKinley* and that his sentence should likewise be vacated because the circuit court similarly failed to give adequate weight to his rehabilitation.

¶ 22    However, as an initial matter, Illinois courts generally do not compare sentences between cases. Indeed, "[t]he propriety of the sentence imposed in a particular case cannot properly be judged by the sentence imposed in another, unrelated case. Simply because a lesser sentence was imposed in another case does not lead to the conclusion that the more severe sentence imposed in the case at hand is excessive." *People v. Fern*, 189 Ill. 2d 48, 56 (1999). Further, there were additional reasons for the outcome in *McKinley* beyond the insufficient weight given to the defendant's rehabilitation, including that the trial court improperly cited the peer pressure placed on the defendant as an aggravating factor rather than a mitigating one (*McKinley*, 2020 IL App (1st) 191907, ¶ 88), that the court gave improper weight to making the sentence a deterrent to future criminal activity (*id.* ¶ 89), and that the court failed to consider the defendant's youth as a mitigating factor (*id.* ¶ 90).

¶ 23    The defendant does not allege that those latter factors are at play in this case. Rather, he focuses on the circuit court's failure to give adequate weight to his rehabilitation. However, unlike the defendant in *McKinley*, we would not characterize the defendant's evidence of rehabilitation as "overwhelming." It is undoubtedly positive and encouraging, but not as extensive as the evidence presented in *McKinley*. See *id.* ¶¶ 73–77. Additionally, in its oral ruling the court expressly stated that it had considered the defendant's accomplishments in prison, including his high school and college degrees, as well as the defendant's work helping to steer younger inmates

from a life of crime. But rather than disregarding or affording no weight to this evidence, the record instead suggests that the court simply placed much greater weight on other factors, including the manner in which the defendant committed the crime and the harm that the loss of such a young child had on Patterson's family, with the court labeling those factors as "very, very aggravating" and "very [aggravating]," respectively. This weighing of the evidence is in the circuit court's sound discretion (see *Branch*, 2018 IL App (1st) 150026, ¶ 34), and we do not view the court's exercise of that discretion to be arbitrary or unreasonable in this case. Accordingly, we do not find the defendant's sentence to be excessive.

¶ 24    In his second issue, the defendant asserts that the circuit court made several additional errors in its oral ruling. Specifically, he argues that the court erred (1) in finding that he had shot Patterson in the back of the head, (2) in considering inherent aspects of the offense as aggravating factors, and (3) in finding the offense to have been "brutal and heinous." We find each argument to be without merit and will address each in turn.

¶ 25    First, the defendant contends that his sentence must be reversed because the court relied on an improper sentencing factor when it incorrectly stated that het shot Patterson "in the back of the head" when Patterson was actually shot in the back between the shoulder blades. It is true that a reviewing court will reverse a sentence when the trial court mentions an improper or incorrect sentencing factor, unless the reviewing court can determine from the record that the improperly considered factor did not increase the defendant's sentence. See *People v. Ross*, 303 Ill. App. 3d 966, 984–85 (1999). But in this case we can conclude that the misstatement of fact did not affect the defendant's sentence. The defendant raised this issue both in his post-sentencing motion for reconsideration and at the hearing on his motion, yet, after being corrected on the facts of the case

and after hearing the defendant's argument, the court reaffirmed the defendant's thirty-eight-year sentence. Thus, it is apparent that the court either understood the facts and simply misspoke, or that the exact location where the defendant shot Patterson was not a factor in the sentence. Indeed, in the context of the case it seems more likely that the important consideration for the court was that the defendant shot Patterson from behind, without regard for precisely where the bullet hit. Accordingly, we see no basis for reversal on this issue.

¶ 26    Second, the defendant asserts that the circuit court erred in citing as an aggravating factor that the defendant caused serious harm. The defendant maintains that serious harm is inherent in the offense of first-degree murder and cannot be considered as an aggravating factor. However, the defendant does not specifically identify where the circuit court made such a finding, and, indeed, it does not appear from the record that the court ever found that the defendant caused serious harm. The court instead found only that the killing was "brutal," "senseless," and "cruel" and that the defendant's actions caused "pain" to both Patterson's and the defendant's families. There was no finding that the defendant caused serious harm. This argument is, therefore, without merit.

¶ 27    Lastly, the defendant asserts that the court erred in purportedly finding the offense to have been "brutal and heinous" within the meaning of 730 ILCS 5/5-5-3.2(a)(1) (West 2020). The defendant contends that such a finding was erroneous because his offense was not of the same character as other "brutal and heinous" cases. However, the subsection of section 5/5-5-3.2 that the defendant cites does not concern "brutal and heinous" crimes but instead relates to the aggravating factor of "caus[ing] or threaten[ing] serious harm," and the provision of section 5/5-5-3.2 that does address "brutal and heinous" conduct, subsection (2)(a), pertains only to extended

sentences, which the defendant did not receive. Moreover, the court did not actually find that the defendant's conduct was "brutal and heinous" as that term is used in Illinois sentencing law. Instead, the court found that "this was a brutal, senseless -- senseless killing." In our view, the court's use of "brutal" was more general and was not intended to be a legal finding that the offense was "brutal and heinous." Accordingly, we find the defendant's argument to be meritless.

¶ 28    Based on the foregoing, we conclude that the circuit court did not abuse its discretion in resentencing the defendant to thirty-eight years' imprisonment, and we affirm the defendant's sentence.

¶ 29    Affirmed.