NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 180383-U

NO. 4-18-0383

FILED
August 18, 2020
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL R. MYERS, Defendant-Appellant. | ) ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of Vermilion County No. 07CF455 Honorable Nancy S. Fahey, Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Steigmann and Justice Holder White concurred in the judgment.

**ORDER**

¶ 1     *Held*: Given defendant's criminal history, the maximum consecutive prison sentences the circuit court imposed on him are not an abuse of discretion.

¶ 2     The circuit court of Vermilion County denied a motion by defendant, Michael R. Myers, to reduce his prison terms for aggravated robbery (720 ILCS 5/18-5(a) (West 2006)) and to make the prison terms concurrent instead of consecutive. He appeals. We affirm the judgment because we find no abuse of discretion in the sentences.

¶ 3                              I. BACKGROUND

¶ 4                              A. The Guilty Pleas

¶ 5     On November 13, 2007, defendant offered to enter blind guilty pleas to two counts of aggravated robbery. In the guilty-plea hearing, the circuit court informed defendant that he had been charged with two counts of aggravated robbery, a Class 1 felony, which carried a possible

sentence of 4 to 15 years in prison, followed by 2 years of mandatory supervised release. The prosecutor remarked that, although defendant was ineligible for extended-term sentences, he was subject to consecutive sentences because there were "[t]wo different incidences." Because the parties had not agreed to a sentence, the court noted that it could impose any sentence within the applicable range. Defendant acknowledged that he understood this. The court admonished him regarding his trial rights, which he waived.

¶ 6        The circuit court then heard the factual basis of the guilty plea. According to the prosecutor, Erin Kingore would testify that on July 23, 2007, defendant entered the Harper Oil gas station in Danville, Illinois, where Kingore was working. Wearing a green hoodie and holding a small pistol, defendant told Kingore to open the cash register. He raised the pistol and pointed it at Kingore, and Kingore heard a click. She handed him between $65 and $68 from the cash register. Then defendant demanded the money in her purse. Kingore told him she did not have any money. Defendant then told her to give him cigarettes. Kingore gave him several cartons of Marlboro cigarettes, and he left. Also, Chayce Wagner would testify that he was working at the drive-through window of a Steak 'n' Shake restaurant. He received an order, and defendant, wearing the same clothing that Kingore identified, pulled up in a van and pointed a pistol at Wagner. Defendant took money from the cash register and left. A Danville police officer, Bruce Stark, would testify that, after defendant waived his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), he admitted robbing both places and that, during the robberies, he was high on medication and drugs. Defense counsel added to the factual basis, noting that the police had recovered defendant's van and clothing containing defendant's DNA on the escape route, as well as a small starter pistol, which was what defendant had displayed in the robberies. Defense counsel explained to the court

that the starter pistol was capable of discharging only powder, not a projectile. The court said it understood.

¶ 7        After hearing the factual basis, the circuit court asked defendant whether he still wished to plead guilty. The court reminded defendant that it had told him "what the possible penalties [were] and *** [that] those would run consecutive." Defendant inquired, "They run consecutive or possible?" Defense counsel responded, "They will run consecutive," and the prosecutor agreed. Defendant said he still wanted to plead guilty. The court accepted his guilty pleas as knowing and voluntary and set the matter for a sentencing hearing.

¶ 8        B. The Presentence Investigation Report, Dated December 19, 2007

¶ 9        1. *Juvenile Offenses*

¶ 10        Defendant, age 26, had the following juvenile record.

¶ 11        On March 7, 1995, in Vermilion County case No. 94-J-361, the circuit court found that defendant had committed battery, and the court adjudicated him to be delinquent. In addition, on April 5, 1995, defendant admitted several counts of theft from a coin-operated machine. For those offenses, the court placed him on probation for two years.

¶ 12        On June 22, 1995, defendant admitted a petition to revoke his probation on the grounds that he had been suspended from school twice; he had been expelled from school; and, prior to his expulsion, he had been failing three of his classes. On August 9, 1995, the circuit court placed him on probation, on the same terms as before.

¶ 13        On April 17, 1996, defendant admitted having violated his probation by committing the offense of unlawful possession of drug paraphernalia. After committing defendant to the Department of Corrections, Juvenile Division, for a 60-day evaluation, the circuit court vacated the order of commitment and placed him on probation for two years.

¶ 14 On March 6, 1997, in Vermilion County case No. 97-JD-22, defendant admitted a petition for the adjudication of wardship, which alleged that he had committed burglary. On April 9, 1997, after revoking probation, the circuit court committed defendant to the Juvenile Division.

¶ 15 On January 5, 1998, defendant was paroled from the Juvenile Division.

¶ 16 2. *Adult Offenses*

¶ 17 On March 22, 1999, in Vermilion County case No. 98-CF-606, defendant entered negotiated guilty pleas to robbery and aggravated battery. On May 4, 1999, the circuit court sentenced him to probation for four years, with the initial first year to be served under intensive probation supervision. The court also ordered defendant to pay restitution, the balance of which was, the report noted, $12,729.55.

¶ 18 On May 6, 2003, defendant admitted having tested positive for cannabis and methamphetamine, a violation of a condition of his probation.

¶ 19 On July 1, 2003, the circuit court resentenced defendant as follows: seven years' imprisonment for count I, robbery, in Vermilion County case No. 98-CF-606; a concurrent term of seven years' imprisonment for count II, robbery; and a concurrent term of five years' imprisonment for count III, aggravated battery.

¶ 20 On October 3, 2007, defendant entered a negotiated guilty plea to theft, a Class A misdemeanor. The circuit court sentenced him to one year of conditional discharge and 47 days of time served.

¶ 21 3. *Physical and Psychological Conditions*

¶ 22 According to defendant, he suffered from no physical disabilities. While defendant was confined, however, in the Illinois Youth Center in Harrisburg, Illinois, a physician named Dr. Levin diagnosed him as having attention deficit hyperactivity disorder, paranoid schizophrenia,

and agoraphobia. Dr. Levin prescribed Klonopin and Sinequan. From 2000 to 2003, defendant received mental-health treatment and anger management services at Crosspoint Human Services. He had to discontinue the treatment, however, because he was unable to afford it.

¶ 23                                    4. *Education*

¶ 24          Defendant attended Danville High School until the 10th grade. Afterward, he earned a general education degree (GED) from the Illinois Youth Center.

¶ 25                                    5. *Employment*

¶ 26          As of the time of the interview for the presentence investigation report, defendant was unemployed. The interviewer asked him what jobs he had held during the previous five years. Defendant answered that he had worked for Campbell's Disposal in Catlin, Illinois, for about a year, until the owner fired him so that the owner could hire his own stepson. The interviewer noted that it had requested employment verification but had received none.

¶ 27                              6. *Alcohol and Drug Usage*

¶ 28                                      a. Alcohol

¶ 29          Defendant reported that he began drinking at the age of 14 and that, until about four months prior to the interview, he had been consuming a 6- to 12-pack of beer a day, along with 1 to 2 pints of vodka. He recognized that he had a problem with alcohol.

¶ 30                                      b. Drugs

¶ 31          Defendant reported that he first smoked marijuana when he was eight or nine. He smoked between a half-ounce and a whole ounce of marijuana per day and, in addition, consumed a fourth of an ounce of cocaine per day. "Cocaine ha[s] ruined [his] life," he remarked.

¶ 32          Defendant also reported that, in the past, he had used "acid," heroin, and mushrooms.

¶ 33        The interviewer noted that, according to a presentence investigation report of June 19, 2003, defendant said he had used lysergic acid diethylamide (LSD) over 800 times in his life and that, for the four years preceding the interview for that report, he mainly used marijuana, cocaine, and methamphetamine.

¶ 34                                C. The Sentencing Hearing

¶ 35        On December 26, 2007, the circuit court held a sentencing hearing.

¶ 36        The State first called Chase Wagner. He testified that he was 18 years old and that he was attending Westville High School. Also, he had a job at Steak 'n' Shake. At 2 a.m. on July 24, 2007, he opened the sliding window to receive defendant's payment for a drive-through order. Wagner testified: "And then he pulled around, I went around to the computer, punched in the numbers, and turned around to the window, opened it up, and he had a gun in my face, and he told me to get down, and I ducked down, ran around the corner, and told another employee that there was a man in the drive-thru with a gun, and she called 911." Then "there was a lot of banging on the door," and "some money [was] missing."

¶ 37        The State next called Erin Kingore, who testified that on July 23, 2007, she was working at Harper Oil. She was alone in the gas station when, at 10:33 p.m., "the door opened, [and] there was a guy walking in with a gun, and that's never happened before." He demanded that she give him the cash in the cash register. She did so: it was "about $64." Then the man "wanted what was in [her] purse." She "told him [she] didn't have any, and he asked for it again, and [she] told him [she] didn't have any money in it." Then the man "said he wanted cigarettes." She handed him "about six or seven cartons of Newports." The man then "put them in his arms and told [her] to be good," and he "walked out the door." Kingore "hit the panic button under the counter, locked both doors, and called the cops." She did not work at Harper Oil any longer.

¶ 38		The prosecutor stated he had no further evidence to offer. The circuit court asked the public defender if he had any evidence to offer. He replied: "Judge, we'd offer for the [c]ourt's consideration a parole violation report regarding [defendant], and essentially, what the—it's his parole officer's report concerning this offense, which is of course also a violation of his previous parole."

¶ 39		Defendant then made a statement in allocution. He wanted to apologize to Wagner and Kingore, but they already had left the courtroom. He explained that, "as a normal person," he would not have committed these robberies but that he had "a real bad drug problem." It was "still [his] fault," he hastened to add. "[He] did it." But he had "a bad mental problem." He should have "[gone] and got the proper help at the mental places that [he] had been [to] before, but [he] didn't." Instead, he "turned to drugs, and it showed [him] what drugs showed [him] the last time, that it's the wrong way to go." In sum, he "just wanted to say [he was] sorry, and sorry for being [t]here."

¶ 40		During the prosecutor's sentencing argument, the circuit court asked the prosecutor:

"How much will he really serve if I sentence him to 15?

		MR. MILLS [(PROSECUTOR)]: If you do 15, he'll do seven or a little more. He's got 147 in, so he'll do maybe six and a half to seven. ***

		THE COURT: If it's consecutive, will the total be seven years? Or will that be seven on each, basically?

		MR. MILLS: Seven on each.

		THE COURT: I'm trying to envision how long he will be locked up for the safety of the public.

MR. MILLS: If sentenced to the maximum, 15 and 15, consecutive, with good time, he will most likely do 14 add a half real years.

THE COURT: Thank you. I always need—I always try to get a grasp on real time. Okay. Is it mandatory consecutive?

MR. MILLS: No. It's discretionary. They are separate offenses."

¶ 41    After the attorneys made their arguments, the circuit court summed up:

"Well, I guess one thing you could say for [defendant] is he's consistent going back to his juvenile court days, which is somewhat relevant, because of the age of the [d]efendant is 26, being born in May of 1981. So, what we have here is a story from the [c]ourt, at least, that begins as far as we know, in 1994. There, he's charged with battery. Ultimately, another supplemental petition is filed that alleges theft from a coin-operated machine. These offenses are being addressed at that time. He ultimately ends up in the Juvenile Department of Corrections, which is referred to by Mr. Mills. Then in '97, he was charged with burglary, and was committed to the Department of Corrections in April of '97, paroled in January of '98. I point that out just for the length of time, which wasn't much.

Then when he hits his adulthood, at least as far as adulthood under the law, he is charged with robbery and aggravated battery. He gets by at first with a probation order, which is not working. That's violated for drug use, if I'm reading this correctly. That's when he caught the sentence to the Department of Corrections for seven years. I guess the icing on the cake, as far as the spree of theft-type crimes, theft-related, whatever they might be; robbery, burglary, theft of a person, whatever. It's all the same. In other words, the nature. *** I think what's worth the

attention is the consistency of the criminality by [defendant], and his choices, which are your choices.

I note in the presentence report, 'Cocaine ruined by life,' is one of the quotes in there. I've never seen cocaine walking around on the streets ruining people's lives. What I have seen is people using cocaine. That's you. It makes me sick to my stomach seeing some teenage kid pulling open the window and asking, 'May I help you?' and having a gun shoved in their face. That freaks me out. I can't imagine it. Then this little girl working in a gas station alone and you walking in there and threatening her. Murderers are made of that. We are lucky, really, that we're not sitting here at a sentencing for some sort of murder charge, so lucky. Those kids are so lucky. That's such an aggravating factor as far as I'm concerned. You have no respect, none, for anybody's property. What I see here is that you have no respect for people, for the persons who work and live in the world around you. You are not someone who is socially fit to live in society. You have proved that over and over again.

I think it's most appropriate that the State asked me for 15 years on each count, and I think it's most appropriate that those run consecutively, and that is the order of the [c]ourt today."

¶ 42    Defendant never filed a timely motion to reduce the sentences.

¶ 43                D. The *Pro Se* Petition for Postconviction Relief
                      and the Summary Dismissal of the Petition

¶ 44    On July 25, 2008, defendant, *pro se*, filed a document titled "Petition for Post-Conviction Relief." In the petition, he accused his defense counsel of having rendered ineffective assistance by failing to file a motion to reduce the sentences. Attached to the petition

was an affidavit by defense counsel, in which defense counsel admitted that, "[t]hrough mistake and inadvertence," he had omitted to file a postsentencing motion even though he had promised defendant that he would file a presentencing motion.

¶ 45      On July 31, 2008, using a fill-in-the-blank form titled "Order," the circuit court ruled as follows: "The motion, complaint[,] or request filed on July 25, 2008[,] in this case is hereby DENIED for the reason that the relief requested is not properly granted in a proceeding under Habeas Corpus and there is no proper basis or jurisdiction to grant the relief requested."

¶ 46                      E. The Agreed-Upon Order

¶ 47      On January 4, 2018, the parties agreed to the entry of an order. The order, signed by the circuit court and the prosecutor, provided as follows:

> "1. That by agreement the Petition for Post-Conviction Relief filed July 28 [*sic*], 2007[,] is allowed and [d]efendant *** shall be allowed hearing on a Motion for Reconsideration of Sentence.
>
> 2. Defendant shall file his Motion to Reconsider within forty-five (45) days and the State shall file any response within forty-five (45) days thereafter.
>
> 3. A hearing on the Motion to Reconsider shall be set by agreement, and the parties shall set this matter for status in forty-five (45) days. The Defendant shall not be w[r]itted back for the status."

¶ 48               F. The Motion for Reconsideration of the Sentences

¶ 49      On March 19, 2018, defendant, through new appointed defense counsel, moved for reconsideration of the sentences. The motion raised the following points:

"4. In this case, through argument and testimony, the court was made aware that the Defendant was armed with only a starter pistol, and no person was harmed by his actions.

5. [The circuit court] did not make a finding that consecutive terms [were] required to protect the public from further criminal conduct by the Defendant, nor was any basis set forth in the record as required by statute.

6. [S]entencing the Defendant to consecutive sentence of 15 years is harsh and would not be in the best interest of Defendant or society and that the same would be detrimental to all."

¶ 50    On May 31, 2018, the circuit court denied the postsentencing motion.

¶ 51    On June 1, 2018, defendant appealed the denial.

¶ 52    On June 3, 2018, defense counsel filed a certificate pursuant to Illinois Supreme Court Rule 604(d) (eff. July 1, 2017), in which he certified that he had "[c]onsulted with Defendant both by mail and in person to ascertain Defendant's contentions of error in the sentence or the entry of the plea of guilty, ha[d] examined the Trial Court file and report of proceedings, and ha[d] made any amendments to the Motion necessary for adequate presentation of any defects in those proceedings."

¶ 53                                II. ANALYSIS

¶ 54    Essentially, the State conceded defendant's claim of ineffective assistance, and defendant received part of the relief he had requested in his postconviction petition: "a hearing to determine post-sentencing relief for Defendant." (In his petition, he also requested that his sentences be reduced and made concurrent.) Now we are reviewing the denial of defendant's motion to reduce the sentences.

¶ 55 We review the denial for an abuse of discretion. See *People v. Reyes*, 338 Ill. App. 3d 619, 621 (2003). For 10 reasons, defendant contends that the consecutive 15-year prison terms were an abuse of discretion.

¶ 56 First, defendant represents that he "never threatened to shoot or otherwise harm the victims, and, importantly, no one was harmed in either incident." But this is a minimization. Implicitly, defendant threatened to shoot the victims by pointing at them what appeared to be a pistol. That is the very idea a pistol-wielding robber intends to convey: hand over the goods or be shot. Because, as it turned out, the pistol was a starter pistol, defendant could not have carried through with his implied threat—but the impossibility of carrying through with the threat did not make it any the less a threat. The victims did not know the pistol was a fake, and defendant was banking on their ignorance of that fact. Being terrified by the possibility of being shot is, contrary to defendant's belief, a harm, an emotional harm.

¶ 57 Second, in his blind guilty pleas and in his statement in allocution, defendant accepted responsibility, and yet, the circuit court imposed upon him the maximum sentences allowable by law. "We agree with defendant that remorse and guilty pleas can be factors in mitigation. However, *** the existence of mitigating factors does not obligate the trial court to reduce a sentence from the maximum allowed." *People v. Pippen*, 324 Ill. App. 3d 649, 653 (2001).

¶ 58 Third, defendant complains that the maximum sentences fail to "account for the uncontroverted significant mitigation evidence in this case, including [defendant's] long history of mental illness and substance abuse." Chronic drug addiction and mental illness are "not inherently mitigating." *People v. Richardson*, 189 Ill. 2d 401, 421 (2000); *People v. Coleman*, 183 Ill. 2d 366, 406 (1998). Those factors, rather, can be aggravating if the circuit court finds they are indicative of future dangerousness. *Richardson*, 189 Ill. 2d at 421; *Coleman*, 183 Ill. 2d at 406. In his

- 12 -

statement in allocution, defendant represented to the court that he had committed the robberies because he had "a real bad drug problem" and "a bad mental problem."

¶ 59 Fourth, defendant argues that the circuit court "failed to consider [his] potential for rehabilitation, despite indications in the record that he was receptive to treatment and rehabilitation." Being, at a particular moment, receptive to treatment and rehabilitation does not necessarily establish a potential for rehabilitation. Defendant had undergone rehabilitative treatment in the past, apparently to no avail. He still had "a real bad drug problem" and "a bad mental problem" that, according to him, caused him to commit the robberies.

¶ 60 Fifth, defendant criticizes the circuit court for "exaggerating the circumstances of the offense—characterizing it as a near-murder." But that is not what the court said. The court did not say that defendant nearly murdered Wagner and Kingore. Instead, after deploring defendant's conduct of pointing a pistol at the face of a teenager who had come to the drive-through window and at a "little girl working in a gas station alone," the court remarked that "[m]urderers are made of that." In other words, the court perceived a coldblooded lack of empathy that, the court was concerned, could express itself in a more serious crime, such as murder. Robberies can go awry and turn into murder.

¶ 61 Sixth, defendant quotes from *People v. Kosanovich*, 69 Ill. App. 3d 748, 752 (1979): "long periods of confinement have little, if any, value in a rehabilitative strategy." But long periods of confinement can have value in protecting the public. See *People v. Hernandez*, 319 Ill. App. 3d 520, 529 (2001) (holding that the factors relevant to deciding a sentence include the protection of the public).

¶ 62 Seventh, defendant observes: "[T]he record indicates that the court did not account for any of the significant factors of mitigation in this case." In fact, defendant points out, the court

did not even "mention the word 'mitigation' or any mitigating factors at all in its lengthy statement in support of its maximum aggregate sentence of 30 years' imprisonment." If the mitigating factors were presented to the court, however, the court is presumed to have considered them. *People v. Branch*, 2018 IL App (1st) 150026, ¶ 37. "To rebut this presumption, defendant must make an *affirmative* showing that sentencing court did not consider the relevant factors." (Emphasis added and internal quotation marks omitted.) *Id.* The sentence does not qualify as such an affirmative showing (*id.*), for, again, "the existence of mitigating factors does not obligate the trial court to reduce a sentence from the maximum allowed" (*Pippen*, 324 Ill. App. 3d at 653). Nor does defendant make such an affirmative showing by noting the court's omission of any mention of the mitigating factors. "The trial judge is not required to detail precisely for the record the exact process by which she determined the penalty[,] nor is she required to articulate her consideration of mitigating factors ***." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). "[I]t is of no moment *** that the trial court failed to articulate its consideration of mitigating facts. [Citation.] And because we must presume that the trial court considered all the mitigating factors before it [citation], absent a contrary indication other than the sentence [citation], the defendant's argument must fail." *People v. Ramos*, 353 Ill. App. 3d 133, 138 (2004).

¶ 63        Eighth, defendant argues that the maximum 30-year prison sentence is grossly disproportionate to the circumstances of the offenses. No one was physically injured, and defendant was armed with a starter pistol, which was incapable of firing a projectile. Case law teaches that the seriousness of the offense is one of the most important factors in the determination of a sentence. *Quintana*, 332 Ill. App. 3d at 109. The circuit court, however, disagreed with defendant's assessment of the seriousness of the offense. The court considered it to be "such an aggravating factor" that, to obtain the money from a cash register and some cigarettes, defendant

threatened deadly force against a teenager and a "little girl working in a gas station alone." Surely, the court had a point. And the court also had a point about defendant's criminal history. See *People v. D'Arezzo*, 229 Ill. App. 3d 428, 434 (1992). "The judge could have regarded defendant's troubled life, with his criminal record, as an indicator of future dangerousness." *Richardson*, 189 Ill. 2d at 421.

¶ 64     Ninth, defendant maintains that the circuit court imposed upon him a double enhancement by considering, as an aggravating factor, that he was armed with what appeared to be a firearm. By defendant's reasoning, his display of a starter pistol was already "a factor implicit in the offense" (*People v. Phelps*, 211 Ill. 2d 1, 11 (2004)), namely, his "threaten[ing] the imminent use of force while indicating *** by his *** actions to the victim that he *** [was] presently armed with a firearm" (720 ILCS 5/18-5(a) (West 2006)). But defendant could have accomplished this element—he could have "indicat[ed] *** by his *** actions to the victim that he *** [was] presently armed with a firearm"—without sticking the apparent firearm in the victim's face and cocking the hammer. *Id.* In any event, the aggravation, in the court's view, was not simply defendant's conduct of brandishing the starter pistol. It was his being unmoved by the youth of Wagner and the vulnerability of Kingore, a "little girl working in a gas station alone." See *D'Arezzo*, 229 Ill. App. 3d at 434 (explaining that, in determining a sentence, the circuit court must consider the defendant's "general moral character" and "mentality").

¶ 65     Tenth, noting that discretionary consecutive sentences should be imposed "sparingly" (*O'Neal*, 125 Ill. 2d at 298) and that they are "rarely appropriate" (*People v. Gray*, 121 Ill. App. 3d 867, 873 (1984)), defendant maintains that the circuit court erred by ordering that the sentences in his case run consecutively. For one thing, he argues, no one was harmed in these offenses to which he blindly pleaded guilty, nor had he intended to harm anyone. Also, in his

assessment, his "criminal history—consisting mostly of juvenile matters and theft-related offenses—[was] not so significant as to justify a need to 'protect the public' from [him], especially considering the [*nine*] *years* that elapsed between his adult cases." (Emphasis in original and quoting 730 ILCS 5/5-8-4(b) (West 2006).)

¶ 66        The question for us is whether "the [circuit] court's determination that consecutive sentences were necessary to protect the public was arbitrary, fanciful, or unreasonable." *People v. Parker*, 2019 IL App (3d) 160455, ¶ 76. Members of the public need protection not only from bodily harm but also from the unlawful deprivation of their property. Section 5-8-4(b) speaks of protecting the public from "criminal conduct" (730 ILCS 5/5-8-4(b) (West 2006)), without specifying that such "criminal conduct" is "limited to conduct that results only in physical harm." *People v. Buckner*, 2013 IL App (2d) 130083, ¶ 41. "We cannot read into the statute a limitation not expressed." *Id.* Although there is, as defendant points out, a nine-year gap between his offenses in the present case and his previous adult offenses, we are unable to say that the court was arbitrary, fanciful, or unreasonable in its view that, since his early teens, defendant had been demonstrating a criminal disregard for other people's property. After all, he has been convicted of four separate offenses of robbery: two robberies in Vermilion County case No. 98-CF-606 and two more robberies in the present case. Robberies can go bad—people can get hurt—and, therefore, not only property but other people's physical wellbeing is at stake. "The record must show that the trial court concluded that consecutive terms were necessary to protect the public." *Id.* ¶ 36. The court so concluded, and the record contains an arguable basis for that conclusion—which, therefore, we cannot fairly characterize as being an abuse of discretion. See *id.*

¶ 67                                III. CONCLUSION

¶ 68    Finding no abuse of discretion in the sentences, we affirm the circuit court's judgment.

¶ 69    Affirmed.