2020 IL App (1st) 191907

SIXTH DIVISION
November 30, 2020

No. 1-19-1907

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of Cook County. |
| | ) | |
| v. | ) | 01 CR 17493 |
| | ) | |
| BENARD McKINLEY, | ) | Honorable Kenneth J. Wadas, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE CONNORS delivered the judgment of the court, with opinion.
Presiding Justice Mikva and Justice Griffin concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Benard McKinley,[1] was convicted when he was 16 years old of first degree murder and sentenced to 100 years in prison. Following an unsuccessful direct appeal and postconviction proceedings, defendant filed a *habeas* petition in the United States District Court for the Northern District of Illinois. The Northern District denied the petition, and defendant appealed to the United States Court of Appeals for the Seventh Circuit. The Seventh Circuit reversed based on the United States Supreme Court case of *Miller v. Alabama*, 567 U.S. 460 (2012). *McKinley v. Butler*, 809 F.3d 908 (7th Cir. 2016). The Seventh Circuit remanded with instructions to the district court to stay the *habeas* proceedings and allow defendant to pursue

_____

    [1]We note that while defendant spells his name "Benard," certain documents in the record and on appeal spell it as "Bernard."

resentencing in the state trial court. Defendant then filed a successive petition for postconviction relief pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2016)), which the trial court granted. After a resentencing hearing, defendant was sentenced to 39 years in prison for one count of first degree murder. Defendant filed a motion to reconsider, which the trial court denied. Defendant now appeals, arguing that the trial court abused its discretion by failing to properly consider his youth and its attendant circumstances in conflict with *Miller*. For the reasons that follow, we reduce defendant's sentence to 25 years in prison.

¶ 2                                                  I. BACKGROUND

¶ 3                                                      A. Trial

¶ 4      The following evidence was presented at defendant's trial. On June 24, 2001, 16-year-old defendant shot and killed a 23-year-old man named Abdo Serna-Ibarra, as he tried to enter a Chicago park. One of defendant's friends, a 15-year-old named Edward Chavera, may have handed defendant the gun. See *McKinley*, 809 F.3d at 909. Chavera then told defendant to shoot Serna-Ibarra. Defendant obeyed, shooting the victim in the back. When Serna-Ibarra turned around with his hands raised, defendant shot him several more times, killing him.

¶ 5      The jury found defendant guilty of first degree murder and personally discharging a firearm that caused the death of another person. The trial court sentenced defendant to 50 years' imprisonment for the murder and a consecutive term of 50 years' imprisonment for the firearm enhancement, for a total of 100 years in prison.

¶ 6                                                  B. Direct Appeal

¶ 7      On direct appeal, defendant argued that (1) the trial court abused its discretion when it responded to a jury question and provided the jury with certain transcripts, (2) the identification evidence was vague and uncertain, and (3) the sentence imposed was excessive. This court

affirmed defendant's conviction and sentence. *People v. McKinley*, No. 1-04-2759 (2007) (unpublished order under Illinois Supreme Court Rule 23).

¶ 8                                      C. Postconviction Petitions

¶ 9      On June 2, 2008, defendant filed a *pro se* postconviction petition that contained 15 arguments. The trial court found that the issues raised by defendant were frivolous and patently without merit. The postconviction petition was dismissed. That decision was affirmed on appeal. *People v. McKinley*, No. 1-08-2790 (2010) (unpublished order under Illinois Supreme Court Rule 23).

¶ 10     On November 15, 2010, defendant sought leave to file a successive postconviction petition, which was denied. This court affirmed the denial on November 13, 2012. *People v. McKinley*, No. 1-11-0513 (2012) (unpublished order under Illinois Supreme Court Rule 23).

¶ 11                     D. *Habeas* Petition—Northern District of Illinois

¶ 12     On June 9, 2011, defendant filed a writ of *habeas corpus* in federal court—the Northern District of Illinois—partly on the ground that his sentence violated the United States Constitution. The petition was initially stayed pending the outcome of the appeal of his successive postconviction petition. On April 18, 2013, defendant moved to lift the stay, representing that he had exhausted all available appeals of the denial of his successive postconviction petition in state court. The court lifted the stay and denied the *habeas* petition on March 31, 2014. *McKinley v. Harrington*, No. 11 C 04190, 2014 WL 1292798 (N.D. Ill. Mar. 31, 2014). Defendant appealed to the Seventh Circuit Court of Appeals.

¶ 13                      E. Seventh Circuit Court of Appeals

¶ 14     The Seventh Circuit Court of Appeals reversed. *McKinley*, 809 F.3d 908. Judge Posner noted in the opinion that "[w]ith no good-time credit or other chance of early release permitted to

persons sentenced for first-degree murder in Illinois, [defendant] will be imprisoned for the full 100 years unless, of course, he dies before the age of 116." *Id.* at 909. The court further stated that "[h]is accomplice, Chavera, pleaded guilty to second-degree murder and was sentenced to 17.5 years in prison." *Id.*

¶ 15      The court stated that to be allowed to argue in federal court that his sentence violated the federal constitution, defendant "had to have pressed it in the state judicial system first." *Id.* This requirement was partly designed to "diminish the burden on the federal courts of post-conviction proceedings by state prisoners." *Id.* The court stated that while defendant had made claims about the constitutionality of his sentence in state court, he "had failed to argue to the state courts on direct appeal that his prison sentence violated the cruel and unusual punishments clause of the Eighth Amendment, which the Supreme Court has made applicable to the states by interpretation of the due process clause of the Fourteenth Amendment." *Id.* at 910. The Seventh Circuit found that by failing to alert the state court to the possible presence of a federal claim, defendant forfeited the right to seek federal *habeas corpus* on the ground that his sentence violated the eighth amendment, "unless he can show that his failure to raise the claim in state court had been excusable." *Id.*

¶ 16      The court noted that defendant argued it was excusable based on the United States Supreme Court's 2012 decision of *Miller*, which held that the eighth amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. *Id.* The court noted that *Miller* stated when sentencing a minor, "we require [the sentencing judge] to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (Internal quotation marks omitted.) *Id.*

4

¶ 17    The Seventh Circuit found that the "sentencing judge in this case didn't do that. He said nothing to indicate that he considered the defendant's youth to have the slightest relevance to deciding how long to make the sentence." *Id.* Rather, the judge noted " 'multiple factors in aggravation apply' " and that the 100-year sentence was " 'necessary to deter others from committing the same crime.' " *Id.* at 911. The court stated that the trial court should have considered whether, in a situation of excitement, defendant had the maturity to consider whether to obey his confederate's order or was prevented by the circumstances from making a rational decision about whether to obey. *Id.* at 911-12.

¶ 18    The court noted that defendant had "no opportunity to invoke *Miller* either in his direct appeal or in any of his state post-conviction proceedings," so "the Illinois state courts have had no opportunity to consider the bearing of *Miller* on the appropriateness of reconsidering [defendant's] sentence." *Id.* at 913. The court stated that "*Miller* speaks to the propriety of a life sentence for juveniles, and an Illinois court might well believe as do we that the sentencing judge in this case utterly failed to consider that 'children are different.' " *Id.* The court went on to state:

> "Murder is of course one of the most serious crimes, but murders vary in their gravity and in the information they reveal concerning the likelihood of recidivism by the murderer. In the case of a 16-year-old kid handed a gun by another kid and told to shoot a designated person with it, it is difficult to predict the likelihood of recidivism upon his release from prison or to assess the deterrent effect of imposing a long sentence on him, without additional information. A competent judicial analysis would require expert psychological analysis of the murderer and also of his milieu. Does he inhabit a community, a culture, in which murder is routine? Are other potential murderers likely to be warned off murder

upon learning that a 16-year-old kid has been sentenced to life in prison, or are they more likely to think it a fluke? Is the length of a sentence a major factor in deterrence? Given that criminals tend to have high discount rates, meaning that they weight future events very lightly, does it matter greatly, so far as deterrence is concerned, whether a murderer such as [defendant] is sentenced to 20 years in prison or 100 years? And here is where *Miller* plays a role. It does not forbid, but it expresses great skepticism concerning, life sentences for juvenile murderers."

*Id.* at 913-14.

¶ 19    Finally, the court stated that the trial court had treated defendant "as if he were not 16 but 26 and as such obviously deserving of effectively a life sentence." *Id.* at 914. The Seventh Circuit vacated the judgment of the district court and remanded the case with instructions to stay further consideration of the *habeas* petition pending defendant's filing of a successive postconviction petition in state court seeking resentencing on the basis of *Miller* and the "concerns expressed in this opinion regarding the sentencing proceeding that resulted in a 100-year prison sentence for a 16-year-old." *Id.*

¶ 20                         F. Successive Postconviction Petition

¶ 21    Defendant then requested leave to file a successive postconviction petition in the circuit court based on *Miller*. Defendant argued that his 100-year sentence was a *de facto* life sentence and therefore unconstitutional. The circuit court granted petitioner leave to file his successive postconviction petition and found that petitioner's sentence was unconstitutional. It ordered a new sentencing hearing.

¶ 22                         G. Resentencing Hearing

¶ 23    The sentencing hearing took place over the course of two days, April 12, 2019, and June 3, 2019, before the same trial judge that originally sentenced him to 100 years in prison. The first witness in mitigation was Dr. James Garbarino, a professor of psychology at Loyola University Chicago, who testified as an expert in the field of developmental psychology. Dr. Garbarino evaluated defendant and reviewed Department of Corrections reports, various certificates of achievement, school records, the presentencing investigation (PSI), and anything else available to him about defendant's life.

¶ 24    Dr. Garbarino testified that normal teenagers have difficulties in executive function, "which is good decision making." He stated that chronic trauma, where there are repeated incidents, tends to reduce an adolescent's "future orientation." In Dr. Garbarino's opinion, defendant experienced chronic trauma growing up in both his family and community. Defendant had witnessed a shooting, he had friends who were killed or injured growing up, he was rejected by his father, at some point he was rejected by his mother in favor of a man, and he was bullied. Defendant was involved with gangs, which Dr. Garbarino testified was very common with adolescents that did not have a support system at home. He stated that the presence of an intact family, or a supportive family, is "often seen as a buffer to gang recruitment and gang membership."

¶ 25    Dr. Garbarino stated that the susceptibility to peer pressure peaks in adolescence "maybe" starting at 12 years old. It was Dr. Garbarino's opinion that defendant was particularly susceptible to peer pressure given his upbringing. Defendant's mother told defendant that she did not want him in her life and turned him over to his grandmother to be raised.

¶ 26    Dr. Garbarino testified that the likelihood was "very high" that defendant would avoid future criminal, antisocial, or violent behavior. Defendant demonstrated an intelligent, active

mind and was engaged in a "massive" program of education and learning. He had been able to function within the academic programs in prison, as well as a college program offered by Northwestern University (Northwestern) that had a very selective admissions process.

¶ 27    Dr. Garbarino stated that human brains do not mature until about 25 years old. Educational experiences can change adult brains. They change thinking patterns, cognitive structures, and the sophistication of analysis. Dr. Garbarino did not see any evidence of deficiency in defendant's decision-making or executive function. Defendant had the ability to maintain a coherent, prosocial posture even in the difficult environment of prison. Dr. Garbarino spoke highly of defendant's ability to manage his educational activities, accumulate certificates of achievement, and complete training programs. He opined that when defendant talked about his perfect attendance in classes he said it would be "crazy" not to have perfect attendance, which Dr. Garbarino saw as "reflecting a mature mind and bodes very well for his future when and if released because there is certainly no social purpose served by continuing to incarcerate him when he has achieved this level of sophisticated rehabilitation."

¶ 28    Nelson Holman, a correctional officer at Stateville Correction Center (Stateville) testified that he had been working there for 24 years and interacted with defendant on a daily basis when he was assigned to work in defendant's cell house. Holman testified that defendant was cooperative and compliant.

¶ 29    Andrew Fox, a correctional sergeant at Stateville testified that he had been working there for 20 years and had recently been assigned to work in the same cell house as defendant. He had worked in that cell house for a little over a year and a half. Defendant was one of the porters of the cell house, so he interacted with defendant every day. To be assigned the position of porter, an inmate must put in a request through the placement officer, and internal affairs investigates

and checks the inmate's background. Inmates typically stay on as porters for 60 to 90 days. Defendant was a porter in his cell house for the duration of Fox's time at the cell house, which was rare. Fox had put a request in for defendant to stay on after the 60 to 90 days as porter. Fox described defendant as quiet, reserved, and "pretty much to himself." Defendant always tried to walk away from confrontations. Other inmates asked defendant for legal advice because defendant's previous job had been a law clerk. Fox never had any issues with defendant and never had to write him up for disciplinary issues.

¶ 30 Jennifer Lackey, a professor of law at Northwestern and the director of the Northwestern Prison Education Program, testified that she had been a professor at Northwestern for 13 years. The Northwestern Prison Education Program is the only degree-granting program in the state of Illinois offering a full liberal arts curriculum. Students at Statevillle are enrolled as Northwestern students. All of the classes are offered by Northwestern faculty members at Stateville, and the program has a "very rigorous admissions process." There is an admissions committee made up of one associate dean and two faculty members, and they invite 20 students per year into the program.

¶ 31 Professor Lackey founded the Stateville prison program because there are other states that have very successful prison education programs. She stated that prison education has been shown "over and over again" that it is one of the most positive interventions in the criminal justice system. National recidivism rates are at about 76.6% "at the five-year mark." Students who graduate in prison with a bachelor's degree have a 5.6% recidivism rate, and with a master's degree, the rate goes down to 0%. Illinois was a state that did not have any postsecondary education programs that were degree-granting, so Lackey worked with Northwestern to start one.

¶ 32    Applications for the program were distributed in the prison, and the committee narrowed the pool of applicants to 40 students based on the submissions. They then held in-person interviews at the prison and invited the top 20 candidates to the program, one of them being defendant. The curriculum is a full liberal arts curriculum. Defendant is in class four days a week, for three hours a day. There are six or seven hours of homework each night.

¶ 33    Professor Lackey testified that defendant was ranked third out of the pool of handwritten submissions they received from Stateville and was admitted into the program after his in-person interview. Lackey testified that she was currently teaching defendant and had previously taught him as well. She spends approximately three hours a week with him. He is a "quiet leader" in the classroom. He participates and is thoughtful in his remarks and interactions with other students. He defuses disagreements rather than inflames them. He is self-motivated and determined. His attendance is impeccable. He comes to class prepared. He is one of the most driven and focused students "in the cohort." He turns in "A level" work, which is graded on the same scale as the Northwestern students on campus.

¶ 34    Professor Lackey testified that if defendant were to be released, it was her opinion that he would do "exceptionally well." Part of the program is "to work on reentry at the other end of students graduating from the program." One of defendant's goals is to attend law school, and Professor Lackey stated, "I think that is an extremely realistic goal." When asked if Professor Lackey had any concerns about his character or temperament, she stated, "I have no concerns whatsoever."

¶ 35    Dr. Christina Rivera testified that she teaches political science at DePaul University (DePaul) and is the director of the Black Diaspora. She met defendant when she started teaching at Stateville in 2018, as part of DePaul's Inside Out Prison Exchange Program. Stateville

applicants submitted a "blind" written application, without any identifying information. Defendant was selected to participate based on his submission. Dr. Rivera taught "Law and Politics," which was an entry course for students interested in law or law school. She grades the students at Stateville in the exact same manner as she grades her students on campus.

¶ 36     Dr. Rivera testified that there were 45 applicants the year defendant applied. She narrowed it down to 15, and the chaplain selected the final 11 students. The applicants must have completed a GED and not have any "tickets" from inside the jail. Defendant was an excellent, hard-working student. He was quiet in class but interacted well with other students in small-group discussions. He was an encouraging classmate. It was clear that he had always done the reading and had thought about the reading.

¶ 37     Dr. Rivera stated that defendant's small group project in her class dealt with LBGTQ rights, particularly the rights of transgender women in the Department of Corrections. The project was to structure a legislative proposal that the students would hypothetically give to legislatures. The end result of their legislative proposal was "quite comprehensive." Dr. Rivera noted that defendant was part of the "State Build a Debate" team. The debate took place in March 2018, where they debated the issue in front of 20 or 30 state legislators and some members of the media. At the end of the debate they were given a chance to speak with the legislators in the audience. From what Dr. Rivera understood, one of the members of the state legislature subsequently met with the students and presented their bill in the last session.

¶ 38     Dr. Rivera stated that she started a law policy "think tank" so that members of the class, both DePaul and Stateville members, could continue to get together and discuss materials from the class that they had rushed through in 10 weeks. Defendant was a consistent member of the think tank up until he began his classes through Northwestern.

¶ 39     Several exhibits were attached to defendant's sentencing memorandum. These included a copy of his GED that he received in 2003 and several educational certificates. Those certificates included behavior management (2001), parenting without violence (2001-02), learning skills for life (2009), handling suppression (2010), conditions of life (2010), successful parenting skills (2011), personal integrity (2011), master craftsman for installation (2016), vinyl decking and railing education program (2016-18), composite railing education program (2016-18), vinyl siding and polymer shake education program (2016-18), CertaWrap master craftsman (2016), Bufftech Fence education program (2016-18), restoration millwork education program (2016-18), CertainTeed shingle quality specialist (2016-18), and a stress management course (2017).

¶ 40     Defendant's Diploma of Legal Assistant/Paralegal from Blackstone Career Institute, which was issued in June 2011, was included in the exhibits. Defendant's transcript from Blackstone Career Institute showed that he completed over 900 hours of classes with an average grade of 94.6% overall.

¶ 41     A certificate for DePaul's Inside Out Prison Exchange Program was attached, showing that he completed the program on June 8, 2018. Professor Rivera submitted a letter describing the workload as daunting. She described defendant's work as "top-notch" and described him as "a mature, reflective person who is motivated to help at-risk youth avoid making tragic mistakes, and instead recognize their worth and value [to] their community."

¶ 42     A certificate for completing a summer workshop in 2018 through Northeastern Illinois University's "The Prison and Neighborhood Arts Project" was also attached. An instructor in the program, Professor Lopez, submitted a letter stating that he was impressed by defendant's "preparedness" and his "ability to work with fellow classmates in a constructive manner."

Defendant was an avid reader and a "positive and calming influence." He was committed to completing the course and served as a model to other students.

¶ 43    Northwestern Professor Mary Patillo wrote a letter stating that defendant distinguished himself in class by his preparedness and improvement and for his gentle demeanor. He responded well to feedback and learned from his mistakes in class. Defendant had "much to offer."

¶ 44    Defendant's work history was detailed showing that he worked as a law clerk in the law library for six months and was a porter in Unit E cellhouse for a year and a half.

¶ 45    Defendant received four certificates of excellence in 2014 for his participation in a program called "Incarcerated Voices," which was a radio program aimed at educating the community about prison life.

¶ 46    Defense counsel noted that defendant's grandmother was in court and had submitted a letter to the court indicating that she would provide a place for him to live when defendant was released. She was in a good neighborhood and would make sure he got to any probation officer appointments, work, or school.

¶ 47    Finally, defense counsel stated, "we urge that 25 years is the appropriate sentence. Bearing in mind that [defendant]'s crime occurred after the truth-in-sentencing statute. So whatever sentence is imposed will be served at one hundred percent. We are urging the court to total 25 actual years." Defense counsel noted that, since *Miller*, there had been 46 cases where a juvenile had been resentenced based on the *Miller* factors in Cook County. Most of those offenders were 17, and "quite a few" were 16 years old like defendant. Almost all the cases were for crimes committed prior to truth-in-sentencing so they would serve 50 % of their sentences. Forty out of forty-six of those cases involve multiple victims murdered. The average of all those

sentences were 31 years, and the median was 30 years. Taking away those that involved more than one victim, there were only six offenders on the chart. Of the six, one received 20 years, three received 25-year sentences, and one received 30 years. The average was 25.2 years for those juveniles resentenced after *Miller* who committed murder as a juvenile.

¶ 48    The State then argued in aggravation. It submitted a letter written by the victim's aunt, Maribel Ibarra, stating that her life had changed dramatically since defendant killed "the only family member that I have here in the United States." The victim had come to Chicago to work and support his family in Mexico. When he was killed, Ibarra had to break the news to his mother in Mexico and then take his body back to Mexico to be buried. She stated, "[s]omeone who kills without mercy will never change; therefore, he should receive no mercy."

¶ 49    The State noted that "the maximum sentence that you can give this defendant is 40 years in the Illinois Department of Corrections. I would submit that this is not a case, even considering all the aggravation and all of the mitigation, that is a minimum sentence." The State asked the court "to sentence this defendant to a substantial period of time above the minimum in the Illinois Department of Corrections."

¶ 50    Defendant then addressed the court. He apologized to the victim's family stating, "Every day, I regret doing it *** I shouldn't have listened to what was told to me." He stated that he could not take it back, but he could show that the mistake will never happen again. He never communicated with the gang he was in since the offense and "suffered some backlash" for it. He stated that after he received his 100-year sentence, he began bettering himself. He wants to help younger people walking down the same path he did and steer them from that because he understands how it destroys lives. He then stated, "I don't want to take the court's time too much. But I also want to apologize to you. 18 years ago, we were standing in this same

courtroom or downstairs, and you asked me a question after you had sentenced me and I ignored you. That was a sign of immaturity and I apologize and I am sorry for that." He continued, "I ask you to have mercy on me and give me at least a chance to be a productive *** person within my community."

¶ 51    The trial judge then spoke. He stated that Dr. Garbarino was "at best a poor witness with very little credibility. I don't give his testimony a lot of weight at all." The trial judge stated that "I think expert witnesses in murder cases should read the police reports so they understand what the facts are in the case." The trial judge stated that when the State asked Dr. Garbarino if he had given defendant an IQ test, Dr. Garbarino responded that defendant was in college, "[l]ike with a certain amount of disdain and disrespect to the lawyer that was asking the question."

¶ 52    The trial judge continued, "[t]here were discussions about like diagnosis like conduct disorder. And I agree with [the State] that [Dr. Garbarino] was trying to fashion justification for why [defendant]'s brain was not fully developed." He said, "There is no question that gang, peer pressure, his [*sic*] irrelevant factor to consider when trying to figure out what was in [defendant]'s brain at that time when he chose to be the original aggressor." The trial judge stated that "various people have mischaracterized the evidence in this case as gang related. There was one gang and one gang only. That's [defendant]'s gang." He continued:

> "One of the key facts was and we hear this phrase a lot, it's come up a lot in the last few years, hands up. Don't shoot. All lives matter. [Defendant] didn't give that any consideration. Was his actions which resulted in murder heartless and merciless? I say, yes. When a man puts his hands up in the air after being shot and doesn't want any more and [defendant] unloaded on him, fired multiple shots into that victim, that is a heartless and merciless act.

15

And coupled with the fact that [defendant] and his gang waited in ambush for these individuals that were going to play soccer after they bought the soccer ball and came out so there was plenty of opportunity to walk away. [Defendant] could not have fired any more bullets when the victim raised his hand in surrender.

The facts in this case warrant a harsh punishment. A 20 year sentence or even a 25 year sentence would be insufficient for this type of factual pattern, gang related shooting on the streets of Chicago. Unarmed victims trying to play soccer.

When I consider all the factors in aggravation and mitigation, I do find that there are a number of factors that weigh in the defendant's favor. He does have rehabilitative potential. There is no question about it.

The evidence from the various teachers and individuals that have been involved with his education have all testified that he does have that pattern.

In addition his conduct in the penitentiary has been admirable. He's not gotten himself into problems and is recognized for some leadership traits within the Illinois Department of Corrections.

I have considered his youth, his recklessness, the suggestibility, the potential for rehabilitation, there's evidence of immaturity, the failure to appreciate the consequences, I am not so sure about that.

His family environment had a lot to be desired. No question about that. Nevertheless, he was in a loving home of a family member. He found a different life on the streets and resulted in tragedy, not only for the victim in the case but for the defendant.

In reviewing all those factors in aggravation, I do cite the factor. I don't give it any greater weight than any other factor in aggravation and mitigation and have considered all of those new factors for someone who is 16 years old but the sentence must deter future criminal conduct.

And defendant's criminal conduct neither caused or threatened physical harm to another. That, of course, is not applicable as a factor in mitigation. Not only that, by multiple firing in a park in the broad daylight in the afternoon hours with other people around, serious physical harm could have happened to other people that were in the park at that time.

The defendant did not contemplate that his criminal conduct would cause or threaten serious physical harm to another.

Nothing in Dr. Garbarino's testimony indicated—would indicate to me that he did not have the ability to contemplate that pulling a handgun and firing it in a crowded park in the afternoon was not the type of conduct that would cause or threaten serious physical harm to another.

The defendant acted under a strong provocation. Not applicable is the factor in mitigation. There were grounds to excuse or justify the defendant's criminal conduct, though failing to establish a defense. There was some evidence of some fist-to-cuff going on beforehand, a fistfight. It was the defendant that brought the gun to the fistfight.

The defendant was only 16 years old. The gun made him older. The defendant's criminal conduct was induced or facilitated by someone other than

the defendant. No. He was part of a pack. Part of the gang. They moved that way and they get strength from each other when they act in that fashion.

*** The defendant did not have a history of prior delinquency or criminal activity. The defendant's criminal conduct was a result of circumstances unlikely to recur.

I believe based on the defendant's rehabilitative potential that this is a possibility. The character and attitudes of the defendant indicate that he is unlikely to commit another crime. I would give points or credits on that factor in mitigation.

I have discussed the factors in aggravation and I have analyzed what the appropriate sentence should be. I have listened to the defense make an argument and considered these other juvenile sentencing outcomes, the *Miller* application in this case and all the implications that arise from that.

The fact that the Illinois Supreme Court has now made the determination that 40 years is the equivalent of—well, the term now is virtual life, I believe. I don't believe that—and the defense was emphatic in that, in that idea that a 40 year sentence would be a life sentence for defendant.

I don't believe it is a life sentence for the defendant. I think the defendant was entitled to more time in the penitentiary than even a 40-year sentence.

But nevertheless, on Count 5, I will sentence the defendant to 39 years in the Illinois Department of Corrections, with three years of mandatory supervised release."

¶ 53    Defendant filed a motion to reconsider his sentence, which was denied. Defendant now appeals.

¶ 54                                    II. ANALYSIS

¶ 55    On appeal, defendant argues that the trial court abused its discretion in sentencing defendant to 39 years in prison because it failed to correctly consider defendant's youth and its attendant circumstances, as well as defendant's demonstrated rehabilitation, in sentencing.

¶ 56    The eighth amendment to the United States Constitution prohibits "cruel and unusual punishment" (U.S. Const., amend. VIII) and applies to the states through the fourteenth amendment. *People v. Buffer*, 2019 IL 122327, ¶ 15. The Supreme Court stated in *Miller* that the "Eighth Amendment's prohibition of cruel and unusual punishment 'guarantees individuals the right not to be subjected to excessive sanctions.' " *Miller*, 567 U.S. at 469 (quoting *Roper v. Simmons*, 543 U.S. 551, 560 (2005)). The eighth amendment's ban of excessive punishment flows from the basic precept that criminal punishment should be graduated and proportioned both to the offender and the offense. *Id.* Our supreme court has stated, "The United States Supreme Court has repeatedly instructed courts to look beyond history to 'the evolving standards of decency that mark the progress of a maturing society' [citation] to determine whether a punishment is so disproportionate as to be cruel and unusual." *Buffer*, 2019 IL 122327, ¶ 15 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).

¶ 57    The Supreme Court in *Miller* established that "children are constitutionally different from adults for purposes of sentencing." 567 U.S. at 471. Our supreme court, relying on *Miller*, summarized the three ways in which this was apparent:

"First, juveniles lack maturity and a fully developed sense of responsibility, which leads to dangerous behavior that is careless, impulsive, and reckless. Second,

juveniles are more vulnerable to negative influences and outside pressures, they have limited control over their own environment, and they lack the ability to extricate themselves from crime-producing settings. Third, juveniles are more capable of change than adults, and their actions are less likely to be evidence of irretrievable depravity." *Buffer*, 2019 IL 122327, ¶ 16 (citing *Miller*, 567 U.S. at 471).

¶ 58    As noted in *Miller*, the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. *Miller*, 567 U.S. at 472. Because the rationale for retribution relates to an offender's blameworthiness, the case for retribution is not as strong with a minor as an adult. *Id.* "Nor can deterrence do the work in this context, because ' "the same characteristics that render juveniles less culpable than adults" '—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment." *Id.* (quoting *Graham v. Florida*, 560 U.S. 48, 72 (2010), quoting *Roper*, 543 U.S. at 571). The Court noted that by removing youth from the balance in imposing life sentences without the possibility of parole, a sentencing authority was prohibited from assessing whether the law's harshest term of imprisonment proportionately punished a juvenile offender. *Id.* at 474. The Court stated:

"To recap: Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the

extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations]. And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." *Id.* at 477-78.

¶ 59    The Court in *Miller* declared that the eighth amendment therefore forbade a sentencing scheme that mandated life in prison without possibility of parole for juvenile offenders. "By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." *Id.* at 479. The Court declined to consider whether the "Eighth Amendment requires a categorical bar on life without parole for juveniles." *Id.* However, the Court stated:

"[G]iven all we have said *** about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty *** of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.] Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 479-80.

21

¶ 60　　Eighth amendment jurisprudence continued to evolve, and in *People v. Reyes*, 2016 IL 119271, our supreme court held:

>　　　"A mandatory term-of-years sentence that cannot be served in one lifetime has the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole—in either situation, the juvenile will die in prison. *Miller* makes clear that a juvenile may not be sentenced to a mandatory, unsurvivable prison term without first considering in mitigation his youth, immaturity, and potential for rehabilitation. *** Accordingly, we hold that sentencing a juvenile offender to a mandatory term of years that is the functional equivalent of life without the possibility of parole constitutes cruel and unusual punishment in violation of the eighth amendment." *Id.* ¶ 9.

¶ 61　　Our supreme court has since noted that

>　　"a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court may make that decision only after considering the defendant's youth and its attendant circumstances." *People v. Holman*, 2017 IL 120655, ¶ 46.

¶ 62　　Subsequently, our supreme court in *Buffer* held that a *de facto* life sentence was equivalent to 40 years or more in prison when sentencing a juvenile. In *Buffer*, the defendant was found guilty of four counts of first degree murder and specifically that he personally discharged a firearm that caused the victim's death. *Buffer*, 2019 IL 122327, ¶ 5. He was sentenced in July 2010. At that time in Illinois, law prescribed a sentencing range of 20 to 60 years for first degree murder (730 ILCS 5/5-4.5-20(a) (West 2008)) and mandated a minimum 25-year additional

prison term for personally discharging a firearm that caused the victim's death (*id.* § 5-8-1(a)(1)(d)(iii)). *Buffer*, 2019 IL 122327, ¶ 5. The court merged the first degree murder counts and sentenced defendant to 25 years on the first degree murder conviction and 25 years for the mandatory firearm add-on, for an aggregate of 50 years, followed by 3 years of mandatory supervised release. *Id.*

¶ 63      The State urged the court to decide when a prison sentence for a term of years imposed on a juvenile defendant is the functional equivalent of life without parole. *Id.* ¶ 29. The State contended that experience and common sense compelled the conclusion that a 50-year sentence for a juvenile offender was not unsurvivable and thus not prohibited for juvenile homicide offenders whose crimes reflect the transient immaturity of youth. *Id.* ¶ 30.

¶ 64      Our supreme court noted that the nature, character, and extent of penalties for a particular criminal offense are matters for the legislature, which may prescribe definite terms of imprisonment or specific amounts as fines or fix the minimum and maximum limits thereof. *Id.* ¶ 35. "We generally defer to the legislature in the sentencing arena because the legislature, institutionally, is better equipped to gauge the seriousness of various offenses and to fashion sentences accordingly." *Id.* "Also, when statutes are enacted after judicial opinions are published, it must be presumed that the legislature acted with knowledge of the prevailing case law." *Id.*

¶ 65      The *Buffer* court noted that the General Assembly, since *Miller*, had determined that the specified first degree murders that would justify natural life imprisonment for adult offenders would warrant a mandatory minimum sentence of 40 years for juvenile offenders. *Id.* ¶ 39. "The legislature evidently believed that this 40-year floor for juvenile offenders who commit egregious crimes complies with the requirements of *Miller*." *Id.* The court stated, "[i]n

23

determining when a juvenile defendant's prison term is long enough to be considered *de facto* life without parole, we choose to draw a line at 40 years." *Id.* ¶ 40.

¶ 66    That brings us to the case at bar. Defendant was sentenced in 2004 to 100 years in prison for a crime he committed when he was 16 years old. He received a new sentencing hearing in 2019 in front of the same trial judge. At resentencing, the trial judge was tasked with considering the *Miller* factors when fashioning a sentence. Those factors are (1) the juvenile's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risk and consequence; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his ability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation. *Miller*, 567 U.S. at 477-78. Considerations of these factors is consistent with section 5-4.5-105 of the Unified Code of Corrections, which now requires the trial court to consider factors taken from the Supreme Court's list when sentencing a juvenile. 730 ILCS 5/5-4.5-105(a) (West 2016). Those factors are:

> "(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

> (2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." *Id.*

¶ 67     Because section 4 of the Statute on Statutes (5 ILCS 70/4 (West 2014)) entitles a defendant "to be sentenced under either the law in effect at the time the offense was committed or that in effect at the time of sentencing," the proper remedy was to apply this new sentencing scheme at resentencing. By applying this new sentencing scheme, the circuit court had the discretion not to apply the firearm sentencing enhancement. 730 ILCS 5/5-4.5-105(b), (c) (West 2016); *Reyes*, 2016 IL 119271, ¶ 4.

¶ 68     Here, the resentencing hearing spanned two days and included five witnesses who testified on defendant's behalf. Defendant also submitted several letters for the trial judge's

25

consideration. After hearing all the evidence, the trial judge noted that he could sentence defendant to anywhere from 20 years up to just under 40 years in prison, as 40 years or over would amount to a *de facto* life sentence pursuant to *Buffer*. The trial court then resentenced defendant to 39 years in prison, with no possibility of parole, plus three years of mandatory supervised release.

¶ 69   Defendant claims that the trial court abused its discretion at resentencing when it (1) incorrectly considered defendant's youth after stating that the "gun made him older," (2) failed to properly consider the role of peer pressure, and (3) failed to properly consider defendant's demonstrated and well-documented rehabilitation. The State maintains that the trial court did not abuse its discretion where it considered all of the relevant factors, including defendant's youth and attendant circumstances.

¶ 70   A circuit court has "broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference." *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). We must give "substantial deference" to the circuit court's sentencing decision "because the trial judge, having observed the defendant and the proceedings, is in a much better position to consider factors such as the defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36. Accordingly, we will not disturb the court's sentencing decision absent an abuse of discretion. *Id.*

¶ 71   One basis for reversing a sentence within statutory limits is where the sentence is greatly at variance with the spirt and purpose of the law, or manifestly disproportionate to the nature of the offense. *People v. Stacey*, 193 Ill. 2d 203, 210 (2000). "[T]he phrase 'excessive sentence' " "is reserved for a sentence within the statutory range but without regard for a particular

26

defendant's rehabilitative potential." *People v. Daly*, 2014 IL App (4th) 140624, ¶ 25 (citing

*People v. Perruquet*, 68 Ill. 2d 149, 154-55 (1977)).

¶ 72    The Illinois Constitution provides that penalties are to be determined both according to

the seriousness of the offense and with the objective of restoring the offender to useful

citizenship. Ill. Const. 1970, art. I, § 11; *Perruquet*, 68 Ill. 2d at 154-55. This constitutional

mandate calls for balancing the retributive and rehabilitative purposes of punishment, and the

process requires careful consideration of all factors in aggravation and mitigation. *People v.*

*Quintana*, 332 Ill. App. 3d 96, 109 (2002). Applying these principles to the instant case, the trial

court abused its discretion in sentencing defendant to a 39-year prison term because the sentence

was imposed with little regard to defendant's significant rehabilitation.

¶ 73    Evidence of defendant's rehabilitation was overwhelming. Defendant obtained his GED

in prison on December 15, 2003. He received over 10 different educational certificates from

prison ranging from 2001 to 2018. He obtained a diploma of legal assistant/paralegal from

Blackstone Career Institute in June 2011, which required more than 900 hours of classes. He was

admitted to DePaul's Inside Out Prison Exchange Program, and his professor described him as

hardworking and encouraging to other classmates. He participated in a summer workshop

through Northeastern Illinois University's "The Prison and Neighborhood Arts Project."

Professor Lopez stated that he was impressed by defendant's "preparedness" and his "ability to

work with fellow classmates in a constructive manner." Defendant was a "positive and calming

influence." He was committed to completing the course and served as a model to other students.

¶ 74    Defendant was recently admitted after a rigorous admissions process to Northwestern and

expects to earn a BA while in prison through the Northwestern Prison Education Program.

Professor Lackey described defendant as one of her most driven and self-motivated students and

that his attendance was "impeccable." She testified that defendant's goal was to attend law school, and she believed that was an extremely realistic goal.

¶ 75    Beyond his impressive education credentials, defendant has been a model inmate. He has had zero tickets throughout his 17 plus years in prison. He worked in the law library as an offender law clerk for six months in 2017, and as a porter in Unit E cellhouse for a year and a half in 2017 and 2018. The correctional officers that testified described defendant as cooperative, compliant, quiet, reserved, and "pretty much to himself." Defendant always walked away from confrontations, and he helped other inmates with their legal questions.

¶ 76    Defendant has also found time to give back to his community while in prison. He participated in "Incarcerated Voices," a radio program aimed at educating the community about prison life. He joined the initiative to reach young people and warn them away from gang activity. He received four certifications of excellence for participating in this program in 2014.

¶ 77    And finally, defendant has shown remorse. He told Dr. Garbarino that on the day of the murder he "should have been thinking rather than me just reacting." He apologized to the victim's family at resentencing, stating, "Every day, I regret doing it." He stated that he could not take what he did back, but he could show that the mistake would never happen again. He also apologized to the court.

¶ 78    After hearing this testimony and reading the letters submitted on defendant's behalf, the trial judge's only comments on defendant's rehabilitation were "he does have rehabilitative potential. There is no question about it." He stated that defendant's "conduct in the penitentiary had been admirable" and that defendant had not "gotten himself into problems and is recognized for some leadership traits within the Illinois Department of Corrections." The trial judge's brief,

general references to defendant's rehabilitation indicate that the trial judge disregarded the extent of defendant's rehabilitation and did not afford it adequate weight.

¶ 79    As noted above, the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." (Ill. Const. 1970, art. I, § 11). This constitutional mandate calls for the balancing of the retributive and rehabilitative purposes of punishment. *Quintana*, 332 Ill. App. 3d at 109. "A reasoned judgment as to the proper penalty to be imposed must therefore be based upon the particular circumstances of each individual case." *People v. Saldivar*, 113 Ill. 2d 256, 268 (1986). Looking at the circumstances in the case at bar, defendant is the epitome of an offender who has been restored to useful citizenship. His sentence, however, does not reflect this.

¶ 80    While we recognize the seriousness of defendant's offense in taking another human's life, we also recognize that the Illinois legislature took the seriousness of the offense into account when fashioning the sentencing range for first degree murder. See *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005) ("the legislature is institutionally better equipped to gauge the seriousness of various offenses and to fashion sentences accordingly"). The sentencing range for a juvenile who commits first degree murder, and who is not irretrievably depraved (*Holman*, 2017 IL 120655, ¶ 46), is 20 to 40 years in prison. The fact that the trial judge in this case sentenced defendant to one year shy of the maximum prison sentence he could give without the sentence amounting to a *de facto* life sentence, indicates that he failed to give proper weight to defendant's extensive rehabilitation evidence. The trial judge, in recognizing that the Illinois Supreme Court's determination that 40 years is the equivalent of a life sentence, stated, "I don't believe that. I think the defendant was entitled to more time in the penitentiary than even a 40-year sentence." The trial court's comments suggest a predisposition to punish certain types of offenders more

29

harshly, and we have found that a trial judge "may not refuse to consider an alternative [sentence] simply because the defendant is in a class disfavored by the court." *People v. Jones*, 284 Ill. App. 3d 975, 980 (1996).

¶ 81    We note that a few days before oral argument, the State made a motion to cite *People v. Lusby*, 2020 IL 124046, as additional authority. The State made the following assertion in its motion: "Logic dictates that if the *de facto* life sentence of 100 years' [*sic*] imposed on the defendant in *Lusby*—who was also 16 years old at the time of his offense and who presented similar mitigation evidence—can pass constitutional muster, the instant petitioner's sentence of 39-years' [*sic*] surely is capable of withstanding a constitutional challenge."

¶ 82    In response to the State's reliance on this additional authority, we note that defendant is not arguing that his 39-year sentence is unconstitutional. Rather, he is arguing that the trial court abused its discretion in imposing the sentence because it was excessive in light of defendant's extensive rehabilitation evidence, as well as other factors.

¶ 83    Additionally, the *Lusby* court's finding that a *de facto* life sentence of 130 years was proper was based on the fact that the trial court, after considering the defendant's youth and attendant circumstances, found the murder to be " 'clearly a depraved act' " and found defendant to be incorrigible. *Id.* ¶¶ 35, 50. This finding of incorrigibility was made after hearing evidence that the defendant broke into a woman's apartment, sexually assaulted her, cut her neck with a knife, and then shot her in the head. *Id.* ¶ 4. The defendant had an extensive criminal history before committing the sexual assault and murder at the age of 16. *Id.* ¶ 13. Since being incarcerated, he had attacked another inmate who suffered a broken nose and a broken orbital bone. *Id.* ¶ 15.

¶ 84    As stated above, our supreme court has noted several times that if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation, it can impose a life sentence on a juvenile, as was done in the case of *Lusby*, as long as it has first considered the defendant's youth and attendant circumstances. *Holman*, 2017 IL 120655, ¶ 46. However, in the case at bar, the trial court made no such finding of irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation, and such a finding would have been wholly unsupported by the record. Accordingly, the trial court in this case could not have sentenced defendant to 40 years or more in prison.

¶ 85    And finally, the State argued in its motion that "*Lusby* instructs that a sentence is constitutional if the record demonstrates that the court received evidence relating to each of the *Miller* factors before imposing sentence." Again, the constitutionality of defendant's sentence is not disputed in this case. There is no question that the 39-year sentence imposed was within the sentencing range of 20 to 40 years.

¶ 86    To the extent that the State is arguing that as long as the court heard evidence on each of the *Miller* factors before pronouncing a sentence, then there can be no abuse of discretion, we disagree. While the *Lusby* court found that the 130-year sentence for the defendant was appropriate due to the trial court's consideration of the *Miller* factors and its finding of incorrigibility, it did not state that as long as a court hears evidence of a defendant's youth and attendant circumstances, any sentence the court fashions within statutory limits will not be an abuse of discretion. We are not meant to merely be a rubber stamp for the sentencing decisions of the trial courts. See *Daly*, 2014 IL App (4th) 140624, ¶ 26. As stated above, a reviewing court may disturb a sentence within statutory limits if the sentence is greatly at variance with the spirt

31

and purpose of the law, or manifestly disproportionate to the nature of the offense. *Stacey*, 193 Ill. 2d at 210. Accordingly, we find *Lusby* to have no bearing on our analysis in the case at bar.

¶ 87    Here, the sentencing ruling also demonstrated that the trial judge did not properly weigh other relevant factors. The trial judge stated that peer pressure was an "irrelevant factor" to consider when trying to determine what was in "[defendant]'s brain when he chose to be the original aggressor." He stated, "The defendant's criminal conduct was induced or facilitated by someone other than defendant. No. He was part of a pack. Part of the gang. They moved that way and they get strength from each other when they act in that fashion."

¶ 88    In contrast to the trial court's analysis, the role of peer pressure is clearly identified as a mitigating factor in the sentencing statute for juveniles. It states that when a sentencing judge is sentencing a person who committed a crime when that person was under the age of 18, the court shall consider "whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences." 730 ILCS 5/5-4.5-105(a)(2) (West 2016). The influence of peers is to be considered in *mitigation*, not aggravation. See *id.* ("the court *** shall consider the following additional factors in mitigation in determining the appropriate sentence"). This is because the Supreme Court has specifically found that juveniles are more susceptible to negative influences and outside pressures, including peer pressure. See *Miller*, 567 U.S. at 471. They have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. *Id.* Here, however, the trial judge used the fact that defendant was influenced by his peers as a factor in aggravation, stating that being part of a pack or a gang gave defendant strength. This is especially egregious in light of the fact that defendant's peer specifically instructed defendant to shoot the victim.

¶ 89      Further, the trial judge gave improper weight to the need to deter future criminal conduct, stating he had "considered all of those new factors for someone who is 16 years old but the sentence must deter future criminal conduct." The United States Supreme Court has found that deterrence does not necessary apply to juvenile sentences. In *People v. Morris*, 2017 IL App (1st) 141117, ¶ 33, this court noted, relying on *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 726 (2016), that "deterrence is diminished in juvenile sentencing because juveniles' recklessness, immaturity, and impetuosity make them less likely to consider possible punishment."

¶ 90      Finally, the trial judge improperly considered defendant's age as it applied to his offense. The trial judge noted that "defendant was only 16 years old. The gun made him older." This statement is directly contrary to the holdings in *Miller* and its progeny, which note that juveniles lack maturity and have an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. *Miller*, 567 U.S. at 471. The fact that defendant used a gun certainly did not cancel out the characteristics that defined him as a juvenile. Rather, it lends support to the fact that defendant lacked maturity which led to recklessness and heedless risk-taking. In fact, the Illinois Supreme Court in *Buffer* remanded the case for resentencing where a 16-year-old had committed first degree murder *with a firearm* because the court failed to consider his youth and attendant circumstances when sentencing the defendant to 50 years in prison. 2019 IL 122327, ¶ 47. That defendant was resentenced to 25 years in prison on remand. That defendant used a gun does not relieve the trial court from considering defendant's youth as a mitigating factor. The trial court's comments in this case were improper and has no basis in law.

¶ 91    Accordingly, looking at the record in its entirety, we find that the trial court abused its discretion by disregarding evidence of defendant's extensive rehabilitation and improperly considering certain sentencing factors during the resentencing hearing. Pursuant to Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967), this court is empowered to reduce sentences. Specifically, the rule states that on appeal, the reviewing court may "reduce the punishment imposed by the trial court." Ill. S. Ct. R. 615(b)(4) (eff. Jan. 1, 1967). Our supreme court has acknowledged that the rule itself "does not set forth the scope of this power or the circumstances under which it should be exercised." *Stacey*, 193 Ill. 2d at 209. As noted above, however, one such example of when this power can be exercised is when, as is the case here, a sentence within the statutory range was excessive. *Id.* at 210. Depending on the surrounding circumstances, we can choose to impose a new sentence or remand the matter for resentencing by the trial court. See *People v. Jones*, 168 Ill. 2d 367, 378 (1995). While we recognize that a reviewing court's power to reduce a sentence should be exercised cautiously and sparingly, we find that in this case it is appropriate for us to impose a new sentence rather than exhaust additional judicial resources that would be expended by ordering a new sentencing hearing. *Saldivar*, 113 Ill. 2d at 268; *People v. O'Neal*, 125 Ill. 2d 291, 300 (1988). Accordingly, we invoke our authority under Rule 615(b)(4) to reduce defendant's sentence to 25 years in prison, followed by 3 years of mandatory supervised release. 730 ILCS 5/5-8-1(d)(1) (West 2016) (the mandatory supervised release term shall be written as part of the sentencing order; for first degree murder that term is 3 years).

¶ 92                                III. CONCLUSION

¶ 93    For the foregoing reasons, we reduce defendant's sentence to 25 years in prison, followed by 3 years of mandatory supervised release.

¶ 94    Sentence modified.

**No. 1-19-1907**

| | |
|---|---|
| **Cite as:** | *People v. McKinley*, 2020 IL App (1st) 191907 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 01-CR-17493; the Hon. Kenneth J. Wadas, Judge, presiding. |
| **Attorneys for Appellant:** | Brian Nisbet, of Winston & Strawn LLP, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Clare Wesolik Connolly, and Hareena Meghani-Wakely, Assistant State's Attorneys, of counsel), for the People. |